# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>26 CAPITAL ACQUISITION CORP., and 26 CAPITAL HOLDINGS LLC,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Plaintiffs and Counterclaim-Defendants,</td><td>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)<br>)</td><td>C.A. No. 2023-0128-JTL</td></tr>
<tr><td>TIGER RESORT ASIA LTD, TIGER RESORT LEISURE AND ENTERTAINMENT, INC., and PROJECT TIGER MERGER SUB, INC.,</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td>Defendants and Counterclaim-Plaintiffs.</td><td>)<br>)</td><td></td></tr>
</table>

## OPINION REGARDING AVAILABILITY OF SPECIFIC PERFORMANCE

Date Submitted: August 25, 2023
Date Decided: September 7, 2023

A. Thompson Bayliss, J. Peter Shindel, Jr., Eric A. Veres, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Rollo C. Baker, IV, Robert S. Loigman, Jesse Bernstein, Todd Beattie, Jonathan Feder, Danielle Lazarus, Edgar Aliferov, Miriam Bial, Aaron Lawrence, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Samuel J. Lieberman, SADIS & GOLDBERG LLP, New York, New York; *Counsel for Plaintiffs and Counterclaim-Defendants*.

T. Brad Davey, Matthew A. Golden, Daniel M. Rusk, IV, Abraham C. Schneider, Hayden J. Driscoll, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Daniel M. Perry, Grant R. Mainland, Jed M. Schwartz, Andrew L. Porter, Christopher Almon, Alison S. Markowitz, Ashley A. Satterlee, Alexander B. Cogut, MILBANK LLP, New York, New York; *Counsel for Defendants and Counterclaim-Plaintiffs*.

**LASTER, V.C.**

This is a broken deal case involving a de-SPAC transaction.[1] This decision addresses whether the SPAC can obtain a decree of specific performance compelling the target to use its reasonable best efforts to close. In many broken-deal cases, specific performance is the first-choice remedy. Yes, it is an extraordinary remedy—in the sense of out of the ordinary because it departs from the ordinary contractual remedy of money damages, but broken deal cases are out of the ordinary. They involve either a unique opportunity to acquire a unique asset at a unique point in time or, conversely, a unique opportunity to be acquired on unique terms at a unique point in time. Transaction agreements generally provide for specific performance, revealing the parties' clear-day remedial preference. But even when a transaction agreement calls for specific performance as the preferred remedy, the decision to grant specific performance always remains with the court.

The transaction agreement in this case calls for specific performance, and this decision assumes that the target breached its obligation to use its reasonable best efforts to close, that the SPAC is ready, willing, and able to close, and that money damages will not

_____

[1] At this point, "SPAC" and "de-SPAC transaction" are likely familiar terms. For the uninitiated, a "SPAC" is a special purpose acquisition company—a shell company that goes public without an operating business, but with a plan to find and merge with an operating business within a fixed period, usually two years. The de-SPAC transaction is the merger in which the SPAC combines with the operating business. In that transaction, the SPAC brings to the table the cash it has raised from its investors plus its public listing. The target brings the operating business. After the transaction, the target has a public listing and additional capital. The SPAC's former stockholders receive equity in the post-transaction entity. If the SPAC fails to find a merger partner, then the SPAC's stockholders get back the money that the SPAC raised in its initial public offering, less expenses.

provide an adequate remedy. Despite those favorable assumptions, the court will not award specific performance. Multiple factors lead to that result.

First, a decree enforcing a reasonable best efforts obligation is not self-executing. Fulfilling the obligation requires identifying tasks that need to be accomplished and deploying the resources necessary to carry them out. The tasks that remain would not pose an impediment to an award of specific performance in a domestic transaction, but in this case, the target is a Philippine corporation that owns a casino in Manila. The corporation has a history of poor governance and last year suffered a forcible takeover that was only resolved through a dodgy bargain to secure political intervention. The nature of the counterparty increases the degree of difficulty exponentially, and the events necessary to get to closing will take place halfway around the world.

Second, to the extent there is a need to back up the decree with coercive sanctions, all roads lead to Manila. When parties are domiciled or have significant assets in the United States, this court can pick from a menu of sanctions. No one has identified any sanction that could be deployed effectively in the Philippines.

Third, closing the transaction could violate a *status quo ante* order issued by the Philippine Supreme Court. Both sides of the deal think that the litigation that gave rise to the order is meritless and that the order was improvidently granted. They originally sought to convince the Philippine Supreme Court to reconsider it. When traditional avenues failed, they resorted to a dodgy bargain, in which they offered substantial personal benefits to powerful figures in return for *ex parte* efforts to influence the justices. But instead of playing ball, the justices issued a clarifying order which made clear that they were

concerned about the de-SPAC transaction. As a matter of comity, a Delaware court should hesitate before directing a Philippine corporation to take action that risks violating an order issued by that nation's highest court.

Finally, the SPAC has engaged in conduct that should not be rewarded with a decree of specific performance. The target contracted with a New York hedge fund to act as its exclusive advisor for the purposes of finding a SPAC partner and negotiating and completing a de-SPAC transaction. Unbeknownst to the target, the hedge fund leveraged its exclusive relationship to secure a 60% ownership interest in the SPAC's sponsor. That meant the hedge fund would profit if the SPAC got a better deal, and it put the hedge fund in a position to work as a double agent. To be clear, the hedge fund did not work both sides of the deal in the sense of helping both parties. The hedge fund partnered with the SPAC.

Unbeknownst to the target, the hedge fund helped the SPAC draft a term sheet favorable to the SPAC. When the SPAC sent the term sheet to the target, the hedge fund pretended not to have seen it before. The hedge fund then advised the target to accept it.

Unbeknownst to the target, the hedge fund helped the SPAC draft a merger agreement favorable to the SPAC. When the SPAC sent the merger agreement to the target, the hedge fund pretended not to have seen it before. The hedge fund then advised the target that the terms were market or otherwise advantageous such that the target should not counter. During the ensuing negotiations, the hedge fund participated in calls with the SPAC, ostensibly as the advisor to the target. During those calls, the hedge fund texted secretly with the SPAC and gave the SPAC advice on what positions to take.

3

Not knowing that its contractual advisor was playing for the other team, the target entered into the merger agreement. After signing, the target hired the hedge fund to assist with a series of deal-related tasks. When pursuing those tasks, the hedge fund continued to work as the SPAC's partner and against its client. It was not until this litigation that the target learned the truth.

The SPAC has attempted to disclaim responsibility for the hedge fund's actions, but the SPAC and the hedge fund worked as partners. The SPAC kept the hedge fund's double-dealing secret and lied about its relationship to the hedge fund. Late in the deal process, when the target became suspicious about the hedge fund, the SPAC allowed the hedge fund to participate secretly in calls so that the SPAC could get real time advice. The hedge fund's actions are properly attributed to the SPAC, and their joint behavior is sufficiently egregious to warrant denying the remedy of specific performance.

There is also the balance of the equities. To issue a decree of specific performance, the equities must clearly and convincingly favor that outcome. Here, they do not.

The denial of specific performance does not mean that no remedy is available. Money damages may be an inadequate remedy relative to the possibility of specific performance, but it is still a possible remedy. The court has scheduled a follow-up trial on the issue of damages. If the SPAC proves breach, and if the defendants fail to establish their affirmative defenses, and if the SPAC properly supports a sum of causally related damages, then the SPAC may be able to recover. If it does, then the SPAC can seek to monetize the judgment using customary collection mechanisms that do not involve the same complications that a decree of specific performance carries.

## I.     FACTUAL BACKGROUND

Trial took place over five days. Thirteen fact witnesses and four expert witnesses testified. The parties introduced 2,281 exhibits, including deposition transcripts from twenty-nine individuals.

In the pre-trial order, the parties agreed to seventy-four stipulations of fact.[2] The court thanks litigation counsel for preparing those stipulations as officers of the court. This decision relies on them when applicable. Having weighed the record and evaluated the credibility of witnesses, the court makes the following findings of fact by a preponderance of the evidence.

### A.     Universal Seeks A Public Listing For CasinoCo.

Universal Entertainment Corporation ("Universal," "UEC," or "Parent") is a Japanese gaming company whose shares trade publicly on the Tokyo Stock Exchange. Kazuo Okada founded Universal and previously served as its Chairman and CEO. Through Okada Holdings Ltd., he controlled two-thirds of Universal's equity. JX 2026 at 3. In 2017, Okada was accused of embezzling funds from Okada Holdings. Litigation in Japan resulted in Okada's son taking over Okada Holdings and Okada being ousted from all of his

---

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Dkt. 318. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit, with the page designated by the internal page number. If a trial exhibit used numbered paragraphs or sections, then references are by paragraph or section.

5

positions with Okada Holdings and Universal. That historical vignette matters because Okada returns later in the story.

Universal's most valuable asset is the Okada Manila Resort & Casino (the "Casino"). Located in the Philippines, the multi-billion-dollar property includes a hotel with dual towers connected by a skybridge, an indoor beach and night club, 3,000 gaming machines, 300 gaming tables, and 993 guest rooms, plus the world's largest dancing fountain.

Universal owns the Casino through Tiger Resorts Leisure & Entertainment, Inc. ("TRLEI" or "CasinoCo"). An intervening subsidiary, Tiger Resort Asia Ltd. ("TRA" or "Holdings"), owns 99.99% of the stock of CasinoCo. CasinoCo is a Philippine entity, and under Philippine law, a director must own stock in the company she serves. Each director of CasinoCo owns one share of its stock, and those are the only shares of stock of CasinoCo that Holdings does not own.

Beginning in 2018, Universal explored the possibility of CasinoCo conducting an initial public offering that would result in its shares trading on a public exchange. The IPO would generate an initial pool of capital, and Universal could use CasinoCo's listed security to raise additional capital through follow-on offerings. Universal wanted to raise capital to pay off $750 million in publicly traded debt. The debt was expensive, requiring interest payments of $70 million per year, and Universal anticipated that it would be difficult to refinance.

Universal investigated listings in Hong Kong, Singapore, the Philippines, and the United States. The effort proceeded slowly. Reputable underwriters were skeptical about a

Philippine-based gaming company, and they questioned Universal's association with Okada. The COVID pandemic negatively affected the Casino's operations and delayed the process.

## B.    Eiseman And Zama Enter The Scene.

Alex Eiseman is the founder of a New York-based hedge fund that operates under the tradename Zama Capital ("Zama").[3] After working as an analyst for over a decade, he started Zama in 2017 with $20 million under management. One of Zama's first investments was a block of shares in Universal. Zama continues to own the investment, which it carries at a loss.

After Zama purchased its shares, Eiseman contacted Universal's head of investor relations, claiming to be a major investor in Universal. In truth, Zama never held more than 144,100 shares, those shares were never worth more than $2.5 million, and the block

---

[3] The Zama hedge fund complex consists of an on-shore fund organized as a Delaware limited partnership, Zama Capital Advisors LP, and an off-shore fund organized as a Cayman limited partnership, Zama Capital Master Fund, LP. The investment advisor for the funds is Zama Capital Strategy Advisors LLC, a Delaware limited liability company.

Eiseman was a troubling witness. In his contemporaneous communications, he regularly misrepresented facts, omitted material information, or flat-out lied. At trial, however, he acknowledged that, contending that his desire to make a profit for Zama's stockholders justified his actions. So on the one hand, he testified honestly about engaging in dishonesty. On the other hand, Eiseman only owned up to his dishonest actions when the defendants had access to contemporaneous texts or emails that he could not deny. When that level of direct evidence was unavailable, Eiseman gave testimony that was not credible. At bottom, he seems fundamentally amoral and willing to say anything that might be personally advantageous. This decision has largely discounted Eiseman's testimony.

7

represented a microscopic fraction of Universal's float. Eiseman is a prolific communicator, and he engaged regularly with Universal's head of investor relations.

## C. The Idea For A De-SPAC Transaction

Toji Takeuchi is an executive officer at Universal who served as head of corporate planning.[4] When Universal began considering a public listing for CasinoCo, Takeuchi was charged with exploring possibilities in the United States. After Universal's head of investor relations left, Takeuchi added that function to his portfolio. In September 2018, when Eiseman could not reach the former head of investor relations, he obtained Takeuchi's contact information and began an ongoing dialogue with Takeuchi.

In July 2020, the financial markets remained captivated by SPACs. Eiseman read in the news that a SPAC named Leisure Acquisition Corp. ("Leisure") lost its de-SPAC transaction partner. Eiseman contacted Takeuchi about the possibility of CasinoCo using a merger with a SPAC to bypass the underwriting process. Eiseman knew an investor in Leisure and thought he could make an introduction.

---

[4] Takeuchi was a perplexing witness. He was credible in the sense that he truly believed what he said when testifying. But he also seemed strangely naïve and out of his depth, and he appeared to have swallowed hook, line, and sinker anything that Eiseman and his colleagues fed him. He also unfortunately believed that everyone was on the same team and working together to accomplish the transaction, including CasinoCo's transactional counterparty. Eiseman consistently manipulated Takeuchi, sometimes by leading him by the nose, other times by browbeating him. Because Takeuchi viewed the world through such strangely tinted glasses, this decision does not rely on his assessments, even though he seems to have believed them sincerely.

Takeuchi asked Eiseman if he had any relationship with Leisure. Eiseman told Takeuchi: "We are completely independent . . . . We are Universal shareholders, and we hope to benefit by Universal's share price going up a lot if there is a deal. . . ." JX 23 at 2.

Takeuchi presented the idea to Jun Fujimoto, Universal's President.[5] He liked the concept and authorized Takeuchi to proceed. Eiseman made the introduction, and Leisure sent Universal an indication of interest in August 2022. After conducting due diligence, Leisure provided a revised indication of interest in December for a transaction that valued CasinoCo at $2.268 billion, excluding land that CasinoCo owned. Leisure anticipated bringing $163 million in cash to the deal, consisting of $13 million on its books plus $150 million to be raised through a private investment in public equity (a "PIPE"). *See* JX 31.

Takeuchi was ready to sign an agreement in principle with Leisure based on the term sheet.[6] Eiseman, however, recommended against it. Eiseman had spoken to other SPACs, and he told Takeuchi that he was using Leisure's proposal as a valuation floor and inviting other SPACs to beat it. He advised Takeuchi that the other SPACs he was talking to had much more cash, ranging from $150 million to $400 million. JX 34.

---

[5] Fujimoto testified at trial. He was generally credible, except when discussing his involvement in a dodgy bargain involving a senior Philippine official.

[6] Takeuchi's willingness to sign an agreement in principle with Leisure (the first SPAC to come along and a weak one at that), provides an early sign of his naïveté.

**D.  Universal Engages Zama.**

In January 2021, Takeuchi suggested a formal advisory relationship with Zama. Eiseman again represented to Takeuchi that their interests were aligned. *See* JX 38 at 3. Eiseman had Akin Gump draft a bespoke engagement letter that he sent to Takeuchi. *See id.* at 2; JX 51 (the "First Engagement Letter").

The First Engagement Letter provided that Zama would

> provide services with respect to analyzing special purpose acquisition companies, blank check companies, "shell company" [sic] (as defined Rule 405 under the Securities Act of 1933) or similar companies (collectively, "**SPACs**") as possible counterparties to a Transaction (as defined below) with the Company. . . . As we have discussed, we will work to make prospective introductions to SPACs and provide our assistance with respect to Transaction advice and Transaction negotiations with potential SPAC counterparties.

JX 51 at 4. The First Engagement Letter defined a Transaction as "any merger, share exchange, asset acquisition or other acquisition, share purchase, reorganization or business combination between [CasinoCo] (or part of its business) and a SPAC." *Id.* The First Engagement Letter made Zama the *exclusive* representative of CasinoCo and its affiliates for purposes of any Transaction. *Id.* (providing that CasinoCo would not "independently (not in conjunction with Zama) directly or indirectly solicit, commence or continue negotiations regarding any Transaction . . . or enter into any Transaction or agreement with any SPAC . . . .").

At trial, Eiseman claimed that Zama was only a finder and fulfilled all of its obligations by introducing Universal to a SPAC. That was untrue. The First Engagement Letter obligated Zama "to make prospective introductions to SPACs" *and* to "provide []

10

assistance with respect to Transaction advice and Transaction negotiations with potential SPAC counterparties." *Id*. Zama also committed to "provide services with respect to analyzing [companies] as possible counterparties to a Transaction." *Id*.

At trial, Eiseman and the plaintiffs' witnesses emphasized language in the First Engagement Letter which stated that when providing services, Zama would act as "an independent contractor" and would not act "in any other capacity including as a fiduciary . . . ." *Id.* They also relied on the following text:

> The Company acknowledges that it is not relying on the advice of Zama for general business, investment advice, financial, tax, legal or accounting matters as it is seeking and will rely on the advice of its own professionals and advisors for such matters, and that the Company will be solely responsible for finally considering and approving the terms and provisions of any Transaction. In recognition of the foregoing, the Company agrees that Zama and its affiliates . . . is not required to restrict its activities as a result of this engagement.

*Id.* Based on this language, Eiseman and the plaintiffs' witnesses maintained that Zama had authorization to invest in the sponsor of a SPAC that would be the counterparty in a Transaction. Nothing in the First Engagement Letter says that. Eiseman also maintained that under the terms of the letter, Universal agreed not to rely on Zama for anything. To the contrary, Universal only disclaimed reliance on Zama for "general" advice on a list of topics, while also making clear the final decision about whether to enter into a transaction was Universal's to make.

At trial, Eiseman and the plaintiffs' witnesses also emphasized language buried in the last substantive paragraph of the First Engagement Letter, after a sentence addressing indemnification, a sentence waiving trial by jury, a sentence designating the New York

11

courts as the exclusive forum for disputes, a sentence disclaiming third party beneficiaries, and a sentence disclaiming responsibility for any information provided by any SPAC. The pertinent sentences stated:

> Neither this agreement nor the receipt of Zama of confidential information nor any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) that would prevent or restrict [Zama] from acting on behalf of other customers or for its own account. Furthermore, [Universal] agrees that neither [Zama] nor any member or business of [Zama] is under a duty to disclose to [Universal] or use on behalf of [Universal] any information whatsoever about or derived from those activities or account for any revenue or profits obtained in connection with such activities.

*Id.* at 5. The paragraph continued with four more sentences: one authorizing signatures by counterparts, one prohibiting assignment, one requiring amendments in writing, and a final sentence stating that "or" meant "and/or." *Id.* Eiseman and the plaintiffs' witnesses insisted that because of this language, Zama could not have acted as a fiduciary to Universal. Whether Zama acted as a fiduciary notwithstanding this language does not affect the outcome of this case, so this decision expresses no view on that issue.

**E.      Eiseman Misleads Takeuchi About Zama's Interests.**

After receiving a draft of the First Engagement Letter, Takeuchi observed that it did not contain any provision that called for Zama to be paid. That was surprising, and Takeuchi emailed Eiseman about it. JX 40 at 1. Before responding, Eiseman and another Zama employee debated whether to be candid with Takeuchi and disclose that Zama planned to invest in the SPAC sponsor and be on the other side of the transaction. Eiseman's colleague told him to "be honest." JX 42 at 2. Eiseman was not.

12

Eiseman told Takeuchi that Zama did "not need any fees from Universal." JX 41 at 1. He offered the following explanation: "We have been shareholders since 2017 following the departure of Mr. Okada and believe that the stock price will more than double with the right deal, and secondly, we might want to participate in the SPAC deal." *Id.*

That was misleading. It was not true that Zama "might want to participate in the SPAC deal." *Id.* Zama indisputably planned to participate economically in the SPAC's side of the deal. Ten days earlier, one of Eiseman's colleagues had been upfront about that fact. When pitching to a banker who represented SPACs, he stated openly that Zama "expects to participate in the SPAC sponsor economics." JX 37 at 3. The banker was surprised by the request and asked to discuss "the notion that your economics would need to come from the Sponsor promote (vs generally dilute everyone incrementally)." *Id.* at 1. The banker wrote back that he did not think he would "get a positive response" from a SPAC if the proposed deal "comes with an ask to [sic] share promote." *Id.* Eiseman intervened and confirmed that Zama wanted "to share in the sponsor promote as we're bringing a fully baked deal to the table at an excellent valuation." JX 39 at 2.

Eiseman's email to Takeuchi was also misleading in its reference to Zama's stockholdings in Universal. Eiseman had been making that claim since originally contacting Universal, and he had repeated it six months before when Takeuchi asked Eiseman if he had any relationship with Leisure and Eiseman responded that Zama was "completely independent…" JX 23 at 2. Based on Eiseman's comments, Takeuchi would later suggest that Zama capital held about two million shares, or 2-3% of Universal's outstanding stock. *See* JX 730 at 3. In reality, Zama never held more than 144,100 shares.

13

Eiseman claimed at trial that the combination of the First Engagement Letter and his email made it clear that he would be investing in the SPAC. That is not so. A reasonable reader would understand that Zama might want to "participate in the SPAC deal" on Universal's side through an award of post-transaction equity or similar arrangement that aligned Zama's interests with Universal's. That is precisely the type of arrangement that Zama later secured for itself from Universal. *See* JX 228. As shown by the SPAC banker's reaction when Eiseman's colleague was candid about investing in a SPAC, that was not customary, and a reasonable reader would not expect it. *See* JX 37 at 1.

Takeuchi could not recall any discussion about Eiseman's response about participating in the deal. He testified that he "wasn't really all that interested or didn't care very much." Takeuchi Tr. 1315. That was because it never occurred to him that Zama would be investing in the SPAC's sponsor and taking a position across the table from Universal. From Takeuchi's demeanor, it was clear that until his testimony, he had no idea that Zama had invested in the SPAC and was on the other side of the deal. He then showed no understanding of the implications of Zama's conflict by dismissing it as irrelevant unless Zama had steered Universal away from a SPAC offering better terms. He did not appreciate that Zama's conflict permeated the negotiation of the SPAC deal. Either he was too naïve or he was in denial.

Universal's legal team reviewed the First Engagement Letter. Their only comment was to request a non-disclosure provision. JX 43 at 1. Zama added one. *See* JX 44.

### F. Zama Brings A SPAC To The Table.

On February 12, 2021, Universal issued a press release announcing that it was formally exploring a public listing of CasinoCo through "the use of a Special Purpose Acquisition Company." JX 46 at 1. Five days later, Universal and Zama executed the First Engagement Letter. *See* JX 48.

Before the issuance of the press release, the senior managers of CasinoCo did not know that a SPAC deal was under consideration. Both Byron Yip, CasinoCo's CEO, and Hans Van Der Sande, CasinoCo's CFO, learned about the effort from the press release.[7]

On March 1, 2021, Takeuchi informed Yip about the SPAC project and told him that "UEC wants all of you to cooperate." JX 53 at 1. He attached a working group list that identified Takeuchi as the project leader. *Id.* at 2. There were two "sub-leaders": Van Der Sande and Kenshi Asano, the CFO of Universal.[8] A working group list for the project identified Universal's "Advisor" on the "Japan Side" as "Baker & McKenzie" and its "Advisor" on the "US Side" as "Zama Capital Advisors LP." *Id.* at 2. Takeuchi's working group list thus treated Zama's role on par with Universal's lawyers. Reflecting their close collaboration, Takeuchi and Eiseman set up a weekly update call. JX 58.

---

[7] *See* JX 51; JX 53. Yip and Van Der Sande each testified at trial. Both are former investment bankers and financially sophisticated. Yip was highly credible. Except for Dan Jones, a non-party accountant, Yip was the most credible fact witness in the case. By contrast, Van Der Sande's credibility was destroyed at trial. Only Eiseman was less credible.

[8] JX 54. Asano testified at trial. Like Fujimoto, he was generally credible, except when discussing his involvement in a dodgy bargain involving a senior Philippine official.

The SPAC project was a big opportunity for Takeuchi, and successfully completing a SPAC deal became his main priority. Takeuchi already trusted Eiseman, and he naïvely took comfort in Eiseman's eagerness to see CasinoCo go public through a SPAC, believing that because Eiseman shared that high-level goal, their interests were aligned. Takeuchi never perceived that Eiseman wanted to use the SPAC to generate profits for Zama or that Eiseman did not care if those profits came at Universal's expense.

Takeuchi and Eiseman agreed that Zama would try to locate SPACs whose sponsors could add value to a casino business. In March 2021, a mutual acquaintance connected Eiseman with Jason Ader, the co-founder and CEO of SpringOwl Asset Management.[9] Ader's claim to fame was serving for eight years as a director of Las Vegas Sands Corp. Through 26 Capital Acquisition LLC (the "Sponsor"), Ader controlled a SPAC named 26 Capital Acquisition Corp. ("26 Capital").

Eiseman sent Ader information about CasinoCo. He noted that based on peer company multiples, CasinoCo had an enterprise value of approximately $5.6 billion and that its equity would be worth $6 billion by 2024. JX 60 at 4. He explained that the SPAC could invest at the Casino's construction cost of approximately $3 billion, giving the SPAC a built-in gain of 100%, plus additional upside. JX 58.

---

[9] JX 56. Ader gave a mixed performance on the stand. He is clearly a savvy operator, and he was well prepared. He testified credibly on some matters but was impeached on others. His memory often failed him on difficult issues.

Before introducing Ader to Universal, Eiseman demanded that Zama be allowed to purchase a 50% interest in the Sponsor. JX 61. Zama made similar requests when contacting other SPACs. Ader countered with a lower percentage. Meanwhile, a SPAC backed by baseball superstar Alex Rodriguez was more generous and had more cash, so Eiseman went with Rodriguez. *See* JX 73 at 2, 3.

At trial, Eiseman implied that he retained Milbank LLP, the defendants' counsel in this action, to advise on Zama buying an interest in a SPAC. That was not so. Eiseman engaged Milbank to address a narrower issue: Whether a buy-side interest would cause Zama to qualify as a broker-dealer for purposes of the securities laws. Milbank advised that it was unlikely that Zama would be treated as a broker-dealer if Zama only acquired a passive economic interest. JX 72; JX 73. Milbank gave that advice over a weekend, then withdrew from representing Zama the next day because of a conflict. *See* JX 74; Eiseman Tr. 1142–43. Milbank did not give a blanket blessing to Zama's buyside interest.

The deal with Rodriguez fell through when he broke up with Jennifer Lopez. The additional value that his SPAC could bring to CasinoCo was a concert by Lopez, so without that tie in, Universal lost interest.

In June 2021, Eiseman went back to Ader. This time, Eiseman asked to invest $5,000,000 in the Sponsor for 5,000,000 Founder Shares and 5,000,000 warrants. JX 84 at 3. Ader countered, and they compromised at 4,000,000 Founder Shares and 4,500,000 warrants. JX 87 at 1; JX 89 at 5. On July 12, 2021, Zama and the Sponsor executed a subscription agreement. Before Zama's purchase, Ader owned a total of 6.875 million Founder Shares and 7.5 million warrants. The equity that Zama purchased from Ader

comprised 58% of the Founders Shares and 60% of the warrants. Zama thus acquired a majority of the economics, but Zama did not gain control over the Sponsor; Ader retained control over both the Sponsor and the SPAC.

At trial, Ader and Eiseman stressed that Zama's investment was not tied to a specific deal. True, but immaterial. Zama had the inside track with Universal, and the investment gave Zama an economic incentive to get the best terms possible for the SPAC. For Ader, having Zama on board gave him an advantage with Universal that he could not expect with any other counterparty. Not surprisingly, Ader shut down his consideration of other targets.

At trial, Ader and Eiseman testified that it is common for SPAC sponsors to sell equity in the sponsor entities, often to fund the expenses of forming the SPAC. Maybe so. No one claimed that it was common for the target's contractual advisor to invest in the Sponsor and be on both sides of the deal.

At trial, Ader testified that he only agreed to let Zama invest because Eiseman gave him the First Engagement Letter, which authorized the investment. Ader and Eiseman both testified that Ader asked whether Universal had approved the investment and Eiseman said yes. Ader also testified that he relied on Zama's representation in the subscription agreement that its investment did not violate any agreements to which it was a party.

It is plausible that when Ader permitted Zama to invest, he had a reasonable belief that Universal had signed off. But Eiseman quickly began acting in ways profoundly inconsistent with that notion, and by August 2021, it was necessarily apparent to Ader that Eiseman was concealing his investment from Universal. Ader, however, played along, and he and Eiseman worked together to conceal Zama's investment and the assistance he gave

18

26 Capital. To cite just one example, Ader did not disclose Zama's investment in 26 Capital's Form 10-K for the year ended December 31, 2021.

## G.     The Letter of Intent

Immediately after Zama bought into the Sponsor, Ader's assistant sent Eiseman a draft letter of intent for a deal with Universal. Ader's draft specified that the Sponsor would receive two board seats and that "Zama and 26 Capital will each appoint a director." JX 105 at 2. That term would have revealed Zama's investment. Eiseman told Ader not to mention the board seats. JX 107. Eiseman then revised the letter of intent. JX 108.

After getting Ader's signoff on the revised letter of intent, Eiseman sent it to Takeuchi. His cover email stated, "I just received an LOI from Jason Ader, the CEO of a SPAC named 26 Capital." JX 113. That was misleading. Eiseman had received a draft of the letter of intent, rewritten it for Ader, and then had Ader send it to him, so it looked like he had not been involved.

Eiseman provided Takeuchi information about Ader and 26 Capital. Eiseman did not mention that Zama had purchased a 60% interest in the Sponsor.

Eiseman set up a call between Ader and Takeuchi. In advance of the call, Ader sent Takeuchi materials about 26 Capital and the potential deal. Eiseman reviewed the presentation and had a prep call with Ader. The presentation did not disclose Zama's investment in the Sponsor, and Eiseman and Ader did not disclose it during the meeting.

The letter of intent contemplated that 26 Capital would bring cash to the deal and that the funds "will come from a combination of (i) cash held in trust at 26 Capital of $275M and/or, (ii) a contemplated Private Investment in Public Equity ('PIPE') of

19

approximately $200M." JX 113 at 2. Ader simultaneously sent an email to his investment bankers at Cantor LLP, told them about the deal with Universal, and noted that that "Brookfield Properties will be providing $200 [mm] in structured PIPE and a $50mm forward purchase at $10." JX 115 at 1. At trial, Ader and Eiseman claimed that there was never any plan for the SPAC to bring cash to the deal. That was not true.

Ader noted in his email to Cantor that he had copied Eiseman, whom he described as "our partner in pursuit of closing this transaction with Universal quickly." JX 115 at 1; *see* Ader Tr. 192. That was an unwittingly candid assessment of the relationship that Ader and Eiseman had established. Regardless of the formal legal structure of Zama's investment, Ader and Eiseman had formed a common law partnership, defined as a joint enterprise in pursuit of profit. Their goal was to profit by closing a deal with Universal on the best possible terms for themselves.

The Universal team thought Ader was an exciting partner who could help create value for CasinoCo because of his experience at Las Vegas Sands. Universal decided to move forward with 26 Capital.

## H. The Deal Negotiations

The next step was to negotiate a merger agreement. During that process, Eiseman and his colleague, Christian Littlejohn, secretly advised Ader on how to get better terms for 26 Capital.[10] Then they turned around and advised Universal to accept those terms.

---

[10] Littlejohn testified at trial by video. His testimony had the same hallmarks as Eiseman's, and this decision treats his testimony similarly.

Eiseman and Littlejohn first met with Ader and one of his colleagues to develop a list of SPAC-favorable deal points that they wanted included in the merger agreement. *See* JX 123. Eiseman and Littlejohn then spent two weeks working with 26 Capital and its lawyers on what terms to propose. On August 3, 2021, Eiseman and Littlejohn participated in a call with Ader and 26 Capital's lawyers. During the call, Eiseman texted Ader to push the lawyers to draft a SPAC-friendly agreement, writing: "Definitely they should do very pro spac." JX 125. Ader responded: "Yes. Most stuff may get missed." *Id.* Eiseman later reiterated the point, writing: "We can actually be fairly aggressive re: pro spac in my opinion." *Id.*

Eiseman also sought to influence Universal's choice of counsel. A few days after the August 3 meeting, Eiseman told Ader that he was going to steer Universal away from using Milbank and toward using a less sophisticated firm. He explained that Milbank "[w]ill be smarter and might push back on some of our sponsor friendly stuff." JX 126.

Eiseman and his colleagues reviewed and commented on three turns of the draft merger agreement before Ader sent it to Universal. After reviewing a draft, Eiseman recommended that they "be silent in the merger doc re: B share conversion and redemptions inclusive of anti-dilution provisions." JX 128 at 1. Those concepts affected how the Sponsor would benefit from the transaction, including being protected against dilution from a PIPE. Littlejohn separately advised 26 Capital's lawyers to omit language on issues such as board composition that might reveal Zama's involvement. *See* JX 131.

On August 16, 2021, Eiseman participated in a call between Ader and Universal about the governance structure of the post-transaction company. Before the call, Eiseman

21

sent Ader a list of talking points with pro-SPAC positions he should take on various issues. JX 133. During the call, Ader noted that Universal's lawyers "don't understand SPACs." JX 135 at 3. Eiseman texted back, "Agree." *Id.* Shortly thereafter, he texted: "It's excellent the other lawyers don't understand spacs. / Although makes it a bit of a pain to structure [it] lowers risk of push back on key items." *Id.*

During a subsequent call between 26 Capital and Universal on August 19, 2021, Eiseman gave Ader advice in real time. During the call, one of 26 Capital's lawyers began talking about the Class B shares and redemptions. Eiseman sent Ader a rapid-fire series of texts: "Have him stop / Now / Don't bring up different shareholder classes / Let's pray this class b comment doesn't lead down a bad path / They had never brought up in front of Japan before." JX 141. Ader responded, "Told him to shut up." *Id.* Eiseman followed up with another string of texts: "Good, could really screw is [sic] with those comments worked hard to bury b shares in the doc, now it's out of the box / Let's just never bring up again and hope they forget." *Id.*

Also on August 19, 2021, Eiseman chastised a law clerk who circulated a working group list for the SPAC project which listed Zama as an advisor to 26 Capital. That was understandable, because that was what Zama was doing, but Eiseman accused him of making a "very serious mistake." JX 144. He insisted that the law clerk immediately circulate a revised list that put his name and Littlejohn's name under Takeuchi's and did not identify Zama separately. He instructed the law clerk to provide the following explanation: "Please note the mistake in the prior draft working group list, [sic] Zama is not part of 26 Capital, it's an investor in Universal and is working with it on the

22

transaction." JX 143 at 1. That was false. Zama *was* part of 26 Capital, and Zama was acting as an *advisor* to Universal, not merely as an investor to Universal. *See* JX 142. The law clerk complied with Eiseman's instructions. *See* JX 139.

Ader did not send a draft of the merger agreement to Universal until August 27, 2021. *See* JX 149. Eiseman advised Ader to "address email sending it over to Takeuchi and myself, and then I can reach out to Takeuchi on Sunday with my take on the doc, etc." JX 2087. When Ader sent the email, he followed Eiseman's advice and addressed it to "Alex and Mr. Takeuchi," as if Eiseman was seeing it for the first time. JX 149 at 1. In reality, Eiseman and Littlejohn had been commenting on drafts all along. Takeuchi and Universal did not learn until this litigation about how Zama helped 26 Capital.

Having advised 26 Capital on how to get a better deal out of Universal, Eiseman switched sides and pitched Universal on why "this transaction is great for UEC." JX 155 at 1. He told Takeuchi off the bat that the draft merger agreement "appears to be standard except for the inclusion of modifications made to accommodate Philippine corporate law." JX 2088. That was not true. Eiseman had worked with Ader and 26 Capital's lawyers to make the draft—in his words—"very pro SPAC."

Universal had its counsel at Baker & McKenzie prepare an issues list. The list consisted of a matrix that identified a series of points in the merger agreement where Universal could push back. *See* JX 154. Belying his claim that Zama was only a finder, Eiseman received a copy of this privileged document so that he could offer input. He added his comments to the matrix, then emailed his version of the matrix to Takeuchi, claiming that his comments "focus on achieving two key objectives: i.) preventing immaterial issues

23

from causing delays and ii.) not risking the deal by trying to renegotiate business points at this stage in the process." *Id.* at 1. That was false. Eiseman was attempting to convince Universal not to counter on a series of material and open issues by claiming that that many of them were (i) immaterial or (ii) previously agreed-upon business points. *Id.*

To sell Takeuchi on the deal, Eiseman advised him that "the three most important items in the agreement" were "i.) valuation, ii.) securing exclusivity (e.g. making sure the SPAC can't back out post signing), and iii.) allowing for enough time to insure [sic] deal completion." JX 154 at 1. All three were skillful distractions.

The valuation in the draft merger agreement was the minimum that Universal wanted. Universal could have bargained for a higher valuation, but that would have been bad for 26 Capital. Eiseman told Takeuchi that Universal should not counter on valuation because the deal valued the Casino "at a very attractive price." *Id.* It valued the Casino at its construction cost.

Securing exclusivity was a non-issue because both Eiseman and Ader dearly wanted to complete a deal with Universal. They were not going anywhere. Immediately after Zama purchased its interest in the Sponsor, Ader abandoned 26 Capital's pursuit of a competing deal. Eiseman did not mention Zama's buyside interest, which was material to Universal's decision on granting exclusivity.

Allowing enough time to ensure deal completion was not a negotiating priority; it was something both sides wanted. An early drop-dead date would let either side walk. Because both sides wanted the deal, neither needed to expend bargaining leverage on the timeline.

24

In contrast to Eiseman's efforts at misdirection, Baker & McKenzie flagged points that Universal should have addressed. Baker & McKenzie highlighted the absence of either a minimal cash condition or an obligation on 26 Capital's part to complete a PIPE to make up any capital shortfall. *Id.* at 5, 9. Having those provisions would be bad for 26 Capital, and Eiseman advised Takeuchi against countering on either point. On the PIPE, he told Takeuchi:

> Business understanding is that no PIPE is required. Post-signing the Sponsor may present additional financing proposals to UEC that may be accepted at UEC's discretion (e.g. new equity issuance by SPAC post-signing requires UEC consent). Business side priority is locking-in the SPAC and the valuation as quickly as possible.

*Id.* at 5. On the absence of a minimum cash condition, he said the same thing. *Id.* at 7. In reality, there was no business understanding on either point; Eiseman simply claimed there was. And Universal's business priority was not locking-in the SPAC or the valuation. That was Ader and Eiseman's priority.

Baker & McKenzie also flagged the possibility of asking for limitations on the Sponsor's equity participation, such as a cutback if the Sponsor did not bring sufficient cash to the deal. *Id.* at 8. Eiseman again advised against countering on this issue, stating: "Business understanding is that there will be no conditions placed on Sponsor's equity other than those already in place (e.g. the Lock-up)." *Id.* There was no business understanding on that point either.

Eiseman did not stop with his initial comments. Again belying his claim that Zama was only a finder, he participated in a call between Takeuchi and Baker & McKenzie about

25

Universal's counter. Eiseman again advised Takeuchi that he should not push back on the points Baker & McKenzie had identified. *See* JX 159. Eiseman also headed off Van Der Sande when he argued a merger agreement without a minimum cash condition or a PIPE contingency was a bad idea. Eiseman told Van Der Sande: "[T]his is the business agreement . . . . You can't touch any of these." JX 1558 at 97. That was not true.

By pretending to be Universal's advisor, Eiseman and Littlejohn convinced Takeuchi not to counter on a series of pro-SPAC points and to overrule changes that Baker & McKenzie proposed. *See* JX 164. For example, Baker & McKenzie wanted Universal to have sole control over the terms of the PIPE. *See id.* at 1. Littlejohn argued that the terms of the PIPE should be mutually acceptable and that such a term "give UEC the ability to control the outcome but not limit the ability of 26 Capital to discuss different PIPE options." *Id.* at 1. That made no sense. Universal could not "control the outcome" if 26 Capital's consent was required. And nothing prevented 26 Capital from discussing different PIPE options in a world where Universal controlled the decision. 26 Capital simply had to convince Universal that its proposal made sense. But Takeuchi trusted Eiseman and Littlejohn, and he believed their doubletalk. Along similar lines, Littlejohn convinced Takeuchi to restore a representation by Universal that Baker & McKenzie deleted, add back in covenants that Baker & McKenzie had removed, and agree that Universal would bear fees rather than having 26 Capital bear them. *See id.* at 1–2.

At trial, Eiseman insisted that he also helped improve the deal for CasinoCo. He points out that he secured a higher valuation than either Leisure or SLAM had offered and that Universal's shares were not subject to a lockup. The fact that the merger agreement

26

was not all bad does not mean that Eiseman did good. A double agent who wants to keep being a double agent must not to be too blatant in their betrayal.

26 Capital's lawyers have stressed that Universal also had other advisors. That is true, just as it was true that were other FBI agents besides Robert Hansen, other CIA officers besides Aldritch Ames, and other MI6 officers besides Kim Philby. Over thirty Baker & McKenzie lawyers worked on the transaction, and Van Der Sande was also a member of the team. But Eiseman was the man whom Takeuchi trusted, and he gave the critical advice about what should be in the agreement. *See, e.g.*, JX 160 at 1; JX 2089.

## I. The Merger Agreement

On October 14, 2021, CasinoCo's board of directors unanimously approved the merger agreement. On October 15, the Universal board of directors approved it.

Zama did not participate in either meeting. At trial, Ader and Eiseman stressed that fact, but it made no difference. Takeuchi made the presentation, and he had internalized Eiseman's palaver. Takeuchi trusted Eiseman and thought he was getting advice from a firm that had committed contractually to help Universal negotiate with a SPAC counterparty. He had no idea that Zama owned 60% of the equity in the Sponsor and was working with Ader to get the best possible terms for 26 Capital.

Takeuchi's report to the Universal directors showed that he did not know that Zama was working as a double agent. He told the directors that Ader owned 6.875 million Class B shares, when in fact Zama owned 58% of those shares. JX 206 at 23. He also told the directors that 26 Capital would bring $275 million to the deal, when 26 Capital actually had no obligation to bring any funds to closing at all. *Id.*

27

Later that month, Universal and Zama entered into a new engagement letter. JX 228 (the "Second Engagement Letter"). 26 Capital's counsel helped Eiseman draft it. This time, Universal agreed to make an upfront payment of $2.5 million in cash plus a deferred payment of $7.5 million in cash and stock if CasinoCo achieved a public listing. *Id.* at 2. Zama agreed "to provide strategy and business consulting services, including services related to [the transaction] as described in the attached Appendix." *Id.* The appendix listed forty-two areas where Zama would provide advice. The list basically encompasses the steps necessary to standup CasinoCo as a public issuer.

At trial, Eiseman argued that Universal agreed to pay Zama contingent compensation of $7.5 million to incentivize Zama to get the transaction closed. Of course, he also claimed that Universal knew he had an interest in the Sponsor, and that interest already gave him an even greater economic incentive to get the deal closed. Eiseman's claim that Universal knew about his buyside interest was false. He only obtained the contingent compensation arrangement because he had successfully concealed his interest in the Sponsor from Universal. The Second Engagement Letter also exemplifies what a reasonable observer would have understood Eiseman meant when he emailed Takeuchi that Zama "might want to participate in the SPAC deal." JX 41 at 1. A reasonable observer would have understood that Eiseman meant some form of transaction-based compensation that aligned Zama's interests with Universal's. No one would have suspected that he meant buying an interest in the Sponsor.

26 Capital has claimed in this litigation that the Second Engagement Letter gave Zama authority to carry out each of the forty-two categories of tasks identified in the

28

appendix. That is not so. None of the tasks were assigned to Zama alone. All were designated for either "UEC/Zama," "UEC/Zama/26 Capital," or "UEC/Zama/26 Capital/Legal." JX 228 at 11–14. The Second Engagement Letter did not give Zama any authority to act unilaterally.

## J.     Ader Enriches Himself.

Shortly after the merger agreement was signed, Ader used the pending transaction to address a personal problem. Ader's mother was an investor in SpringOwl and wanted to exit. She retained Proskauer Rose LLP to represent her and put pressure on Ader.

To solve his personal problem, Ader pitched an investment in the Sponsor to the family office of a billionaire investor (the "Family Office"). Ader told Universal that the Family Office was a potential PIPE investor and should be given access to the data room set up for PIPE investors. *See* Ader Tr. 219–221; JX 242. In reliance on Ader's representation, Universal signed a non-disclosure agreement with the Family Office, and the Family Office accessed the data room.

But the Family Office was not a PIPE investor. Ader pitched the Family Office on a direct investment in the Sponsor that would give him liquidity to buy out his mother. Through an entity called Rimu Capital Ltd., the Family Office paid $25,000,000 to the Sponsor to purchase 2,500,000 of the Sponsor's Class B Founders Shares (approximately 36% of the total) and warrants to purchase 2,500,000 Class A shares (approximately 33% of the total). JX 1646 at 8. Ader immediately distributed the money to himself, paid his mother $16 million, and pocketed the rest. Universal did not learn of Rimu's interest in the Sponsor until this litigation.

After the Rimu transaction closed, Ader retained only 875,000 Class B shares in the Sponsor and 1.5 million warrants. He had sold 6 million of the Sponsor's 6.875 million Class B Founders Shares (87%) and 6 million of the Sponsor's 7.5 million warrants (80%).

**K.     Progress Toward Closing**

After the signing of the merger agreement, Universal and its subsidiaries worked diligently to get to closing. They made rapid progress. The Philippine Amusement and Gaming Commission signed off on the transaction in November 2021. The Philippine Bureau of Internal Revenue and the Philippine Central Bank granted their approvals in March 2022. The Philippine Securities and Exchange Commission granted its approval in April 2022.

The parties also made progress on the Form F-4. They filed a confidential draft with the SEC on December 13, 2021, and the SEC provided comments on January 16, 2022. The Form F-4 was filed publicly on February 22, 2022. The parties twice amended the Form F-4 in response to additional comments from the SEC. *See* JX 1652.

Despite the objective evidence of progress, 26 Capital tried to prove that CasinoCo's two top managers—Yip and Van Der Sande—opposed the deal unless they obtained bonuses and employment agreements for themselves. That is not what the evidence shows.

Yip and Van Der Sande did think that they should receive transaction bonuses. They thought that was standard, and they wanted what management usually got. *See* JX 210; *see also* Yip Tr. 686–88.

30

Yip was also concerned for his job. He had been left off the deal team, and he understood that Fujimoto, Universal's CEO, wanted to replace him with Asano, Universal's CFO. *See* JX 200; Yip Tr. 690.

Eiseman was interacting with Yip and Van Der Sande and learned about their concerns. He caucused with Ader. They thought Yip and Van Der Sande were making reasonable requests and that having their support would help get the deal closed, so they went to bat for them.

Eiseman and Ader argued to Universal that Yip and Van Der Sande should get transaction bonuses. JX 2291 at 5; Yip Tr. 688. They also tried to protect Yip's job. They had a call with Fujimoto, who made clear that he wanted to replace Yip with Asano. *See* JX 2097. After the call, Ader emailed a letter to Fujimoto, copying Eiseman and Takeuchi, to express his "strong recommendation that Byron [Yip] remain as President of [CasinoCo] at least until the close of the SPAC merger." JX 356 at 2.

Fujimoto would not back down and insisted on, at a minimum, Asano having a position at Holdings that gave him authority over Yip. *See* JX 362; JX 367. Ader called Yip, referenced "combat pay," and asked what type of employment agreement he would need to feel secure working towards the closing, even if it meant that he was terminated afterward. *See* Yip Tr. 839–40. Yip responded that both he and Van Der Sande needed employment agreements, and he sent Ader an email outlining the provisions he thought his agreement should contain. Yip did not make any increased demands, only what he had previously asked for and what Eiseman and Ader thought would be reasonable. *See* JX 367 at 12. Eiseman and Ader agreed with his request. *See* JX 368; *see also* JX 379. Ader

31

testified at trial that Yip demanded the agreement as a quid pro quo for supporting the deal. That testimony was not credible. Ader was the initiator, not Yip.

The employment agreements, however, were not forthcoming. In April 2022, Van Der Sande had the creative idea that Ader could join CasinoCo's board and approve the employment agreements. Ader and Eiseman were ready to give it a try. *See* JX 1667. But 26 Capital's lawyers stepped in and told Ader that it was a terrible idea. *See* JX 473; JX 1668. Ader followed his lawyers' advice, and the idea died.

## L. The Status Quo Ante Order

At the end of April 2022, a surprise ruling from the Philippine Supreme Court threw a wrench into the deal process. Since his ouster from Okada Holdings, Okada had challenged his removal through litigation in Japan, Hong Kong, and the Philippines. Okada's lawsuits in Japan and Hong Kong had failed. In the Philippines, a trial court had ruled against Okada, and the intermediate appellate court affirmed that ruling.

Okada appealed to the Philippine Supreme Court. On April 27, 2022, the Philippine Supreme Court issued an order which directed CasinoCo, without further explanation, "to observe the status quo prevailing prior to the removal of [Okada] as stockholder, director, chairman, and CEO of [CasinoCo] in 2017." JX 504 (the "Status Quo Ante Order").

On May 1, 2022, CasinoCo learned that Okada planned to hold a meeting of stockholders and install a new board of directors. The next day, a group loyal to Okada, escorted by a local sheriff, visited the Casino and demanded control. When Van Der Sande refused, the group left after threatening that everyone was in contempt.

32

Initially, the parties thought Okada's litigation was frivolous and that the Status Quo Ante Order had been granted improvidently. CasinoCo filed an emergency motion for reconsideration, which everyone expected to set matters straight. *See* JX 512. In the meantime, the parties disagreed about what the Status Quo Ante Order meant for the transaction. Ader and Eiseman wanted to move rapidly to closing. *See* JX 521; JX 526. They argued that 26 Capital should provide minimal additional disclosure, such as through a Form 8-K or an additional risk factor in the Form F-4, and that nothing else was necessary. *See* JX 535; JX 536.

The Universal side was more cautious. They thought that more detailed disclosure was necessary. They also worried about closing without first convincing the Philippine Supreme Court to modify or lift the Status Quo Ante Order. *See* JX 544 at 1; JX 546; JX 554; JX 1698; JX 1700; JX 2109. Not surprisingly, the Universal parties received extensive legal advice on the implications of the Status Quo Ante Order. *See* JX 1577.

Eiseman caucused with Ader, and they decided that 26 Capital should ask Universal to amend the merger agreement to extend the outside date for completing the deal to October 1, 2022. Eiseman and Ader co-wrote a letter, and Ader sent it. *See* JX 525; JX 533. Eiseman then advised Takeuchi to push Fujimoto to accept the extension. JX 528; JX 529. Eiseman told Ader that he wanted "to raise hell to close by 6/30" and "to be in a super strong position to make sure that they can't terminate." JX 536 at 2. When Eiseman referred to "they," he meant Universal, his contractual client.

Eiseman began raising hell. To put pressure on Universal, he claimed that 26 Capital would sue if they did not move quickly to closing. *See* JX 552; JX 553; JX 2270; JX 2111.

33

Although Zama had contractually agreed to act as Universal's advisor, Eiseman accused Universal of inventing pretexts. *See* JX 543; JX 1830. Despite not being a lawyer, despite having no expertise in Philippine law, and despite never having been involved in a capital markets transaction, Eiseman claimed that the Status Quo Ante Order posed no impediment to closing, and he accused Universal of "attempting to use the Status Quo Order as a legal excuse." JX 546 at 2.

Van Der Sande could not understand Eiseman's behavior and began to suspect that he was working with Ader. JX 541 at 4. In a particularly egregious incident, Eiseman secretly joined a call between Ader and Van Der Sande about closing. JX 541. During the call, Eiseman texted advice to Ader about what to say. When Van Der Sande asked Ader if he was working with Eiseman, Ader lied. He told Van Der Sande that he had not talked to Eiseman for days. *Id.*

On May 20, 2022, Universal received a no-comment notice from the SEC indicating that the Form F-4 would be declared effective as soon as it was resubmitted with a risk factor disclosing the Status Quo Ante Order. JX 537. The SEC approved the revised Form F-4 on May 27, permitting the transaction to proceed. JX 571.

## M.    The Takeover

On May 31, 2022, a platoon of local police entered the Casino, gained physical control of the premises, and forcibly ejected CasinoCo's management. They were led by Dindo Espelata and Antonio "Tonyboy" Cojuangco, two of Okada's lieutenants.

Universal no longer had access to CasinoCo's finance, accounting, and legal departments. CasinoCo's local auditor refused to do any additional work. UHY LLP, which

34

had audited CasinoCo's financial statements for purposes of the Form F-4, withdrew its consent to use its opinion letter for the transaction.

CasinoCo presented videos at trial that showed the violent nature of the takeover. Even Ader and Eiseman found the videos shocking. *See* JX 583. Everyone's immediate priority became ensuring the safety of their employees and regaining control of the Casino.

Except, that is, for Ader, Zama, and Takeuchi. Ader and Zama seemed not to care about the fate of the employees and remained laser focused on closing the transaction. *See* JX 575; JX 579; JX 581; JX 582; JX 585; JX 588; JX 592. Takeuchi followed their lead and instructed Van Der Sande to sign a filing with the SEC. When Van Der Sande told him that the takeover made that impossible, Takeuchi insisted: "They are clearly breaking laws and terrorists. We will shut them out and Okada Manila will just keep business as usual. Also we will continue SPAC transaction." JX 580 at 4.

On June 1, 2022, Universal received a memorandum from Baker & McKenzie's Tokyo office providing expedited advice about whether to try to close the transaction, notwithstanding the takeover and the Status Quo Ante Order. The memorandum described the language of the Status Quo Ante Order as "unclear" and noted that it was "difficult to accurately determine the scope of the Order." JX 595 at 3. The lawyers suggested that any change to CasinoCo would likely constitute a violation of the Status Quo Ante Order, but that because the transaction contemplated the creation of a new intermediate holding company that was technically not subject to the order, and because that entity would issue only a minority of its shares to the public, proceeding with the transaction was "low risk."

35

*Id.* The lawyers nevertheless recommended waiting to close the transaction until the Philippine Supreme Court had clarified or lifted the Status Quo Ante Order. *Id.* at 4.

With the benefit of this advice, the parties believed that the transaction could close in June 2022. *See, e.g.*, JX 602 at 1. By that time, they expected to have regained control of the Casino and to have clarification that the Status Quo Ante Order did not prevent closing. That is not what happened.

## N. The Dodgy Bargain

Universal and CasinoCo initially tried to regain control of the Casino using the judicial process. CasinoCo had already filed an emergency motion for reconsideration with the Philippine Supreme Court. After the takeover, CasinoCo filed a supplement on June 9, 2022. The Philippine Supreme Court took no action.

Meanwhile, on June 3, 2022, Michelle Lazaro suggested an alternative to the judicial process. Lazaro was a director of CasinoCo and its Corporate Secretary. She and another director, James Lorenzana, moved in elite circles in the Philippines.

In an email to Asano, Takeuchi, and a Universal director, Lazaro explained that she and Lorenzana had a relationship with a "common friend" who was a "key person" in the Philippines, who had "helped UEC in the past," and who was "the best option to lead UEC out of this current disturbing situation." JX 605 at 1. She also said that "the key person (our common friend) feels that my involvement moving forward is indispensable" such that he was "reluctant to provide further assistance or to pursue any potential partnership" unless her "concerns" were addressed. *Id.* at 2.

36

The "common friend" was Martin Romualdez, Speaker of the House for the Philippines, a nephew by blood of former Philippine First Lady Imelda Marcos, nephew by marriage of former Philippine President Ferdinand Marcus, cousin of Philippine Senator Imee Marcos, and cousin of then President-elect Ferdinand "Bonbong" Marcos. JX 674. To confirm her connections, Lazaro texted Takeuchi two pictures of herself with Romualdez. She noted that a third individual in one of the pictures was the chair of the Philippine Gaming Commission. *See* JX 641.

Lazaro's email led to a term sheet. It provided as follows:

- Lazaro and Lorenzana would receive payments from CasinoCo of $35,000 per month (net of taxes).

- The board of CasinoCo would be expanded to thirteen members with Lazaro and Lorenzana having the right to designate six.

- The Casino Committee's key officers, including Yip and Van Der Sande would receive three-year, evergreen employment agreements.

    o The new agreements would more than double their compensation.

    o The new agreements would only permit them to be terminated for cause by a supermajority of the board, which would require consent from Lazaro, Lorenzana, and their designees.

JX 656. Ader approved the term sheet. *See* JX 655 at 1. Fujimoto signed it. JX 656.

The plan for moving forward also involved delivering something to Romualdez. The head of Universal's overseas operations would make a "business trip to the Philippines" carrying "heavy luggage" that included an "item" for "No. 2." JX 725 at 4. Once "the actual item arrives safely," then a different senior Universal executive would

37

"set up an interview with Martin." *Id.* Asano noted that at that point, "[s]ince we have kept our promise, it is No. 2's turn to keep the promise." *Id.*

Ader testified that he was unaware of any scheme involving Romualdez, but that testimony was not credible. *See* Ader Tr. 282–84. Both Ader and Eiseman understood the strategy and were on board. For example, on the same day Lazaro sent her email, Eiseman's partner Littlejohn texted Ader that "UE has enlisted significant political support from a VERY high level of the Philippine government with compensation of the arrangement all tied to taking back control of the casino." JX 647. Two days later, Van Der Sande texted Ader and told him that the information he received was "very highly confidential" and "very sensitive" and could not be discussed publicly. JX 665. Eiseman then researched Romualdez and sent the information to Ader and Littlejohn. JX 674. Ader admitted that hearing about "No. 2" and knew that it was an alias for a high-ranking Philippine official. Ader Tr. 280. Although he claimed at trial to have thought "No. 2" meant Lazaro, that was not credible. *Compare* Ader Tr. 280 *with* Ader Dep. 238–41.

Ader and Eiseman supported the plan by writing letters designed to create the impression that the deal would fall apart unless the Philippine Supreme Court lifted the Status Quo Ante Order. Ader sent a letter asserting that Universal and CasinoCo had breached the merger agreement. *See* JX 720. Eiseman sent a letter from Zama questioning what Universal was doing to address the takeover. *See* JX 719.

On July 27, 2022, Universal executive Sato Nobuki traveled from Japan to the Philippines. Another Universal executive, Hajime Tokuda, scheduled a meeting with Romualdez for the next day. JX 730.

The meeting lasted ninety minutes. To accommodate the meeting, Romualdez returned from inspecting an earthquake disaster area in Luzon. JX 731 at 3. The Universal executives gave Romualdez the letters from 26 Capital and Zama to show that "it would be a huge problem if the ruling by the Supreme Court was prolonged any longer." *Id.* Then they told Romualdez that they "wanted to ask a favor of an early resolution." *Id.* Romualdez "then and there" made *ex parte* calls and sent a text to several members of the Philippine Supreme Court, including its "chairman." *Id.* at 4. The Universal executives understood that there were three judges involved, with "one judge on the other side" and two judges "[o]n our side." *Id.* The Universal executives reported to their colleagues that "the pressure by No. 2 must be working." *Id.*

Expecting that Romualdez's intervention would end the takeover, the parties executed an amendment to the merger agreement. It extended the outside date for closing the transaction to October 1, 2022. JX 685.

No one addressed the legality of this type of arrangement in the Philippines. It nevertheless appears that Lazaro and Lorenzana brokered a dodgy bargain in which they offered to have Romualdez intervene in return for (i) increased control over CasinoCo's board, (ii) compensation of $35,000 per month (net of taxes), (iii) employment agreements for the local executives like Yip and Van Der Sande, and (iv) an "item" for Romualdez.

At trial, Universal's witnesses offered a series of implausible explanations for the dodgy bargain. They claimed that the "heavy luggage" referred to original documents from the lawsuits against Okada in Japan and Hong Kong that had to be transported by hand, either because the takeover had deprived CasinoCo of access to its printers, Asano Tr. 794,

39

812, or because Philippine law required the submission of originals in court filings, Van Der Sande Tr. 534. That testimony was not credible.

First, CasinoCo had lawyers, and their lawyers had printers. Second, Philippine law permits the use of electronic versions. Third, Universal had already filed documents from those lawsuits as part of its original efforts to lift the Status Quo Ante Order. Fourth, a senior Universal executive would not be tasked with carrying documents when a courier would do. Fifth, the internal Universal emails referred to an "item," which is an odd word to use for documents. Sixth, the internal Universal emails spoke in code, referring not only to the "item" and "heavy luggage," but also to "Martin" and "No. 2." Discussions about court filings do not require that type of subterfuge. Finally, when the Universal executives met with Romualdez, they showed him the letters from 26 Capital and Zama about the deal being in jeopardy. Those letters were not heavy.

## O.    The Clarifying Order

After meeting with Romualdez, CasinoCo made an additional filing with the Philippine Supreme Court seeking vacatur of the Status Quo Ante Order. JX 733. The filing included the letters from 26 Capital and Zama. *Id.* at 9, 11. Everyone expected that the Status Quo Ante Order would soon be lifted.

To Universal's consternation, the Philippine Supreme Court did not play ball. Instead, on August 10, 2022, the Philippine Supreme Court issued a clarifying order that explained that Okada was an "indirect or beneficial" owner of CasinoCo's equity and therefore was entitled to "preserve the corporate assets" of CasinoCo against "dissipation" while the lawsuit challenging his ouster worked its way through the Philippine courts. JX

40

753 (the "Clarifying Order"). Okada's claims of dissipation included a challenge to the de-SPAC transaction itself, which Okada claimed would "bankrupt" CasinoCo. *Id.* at 5. The Clarifying Order remanded the matter to an intermediate appellate court to evaluate, among other things, whether CasinoCo intended to list its shares in the United States. *Id.* at 19. The Clarifying Order made clear that the Status Quo Ante Order remained in effect pending the outcome of that inquiry. But the Clarifying Order also stated that the intent of the order was not to cause "disruption" and that the order did not "direct the doing or undoing of acts." *Id.* at 12–13.

Through these statements, the Clarifying Order seemed to reaffirm the Status Quo Ante Order and to confirm that it applied to the de-SPAC transaction. There was now greater risk that closing would violate the Status Quo Ante Order, not less.

**P.      The Forcible Retaking Of The Casino**

After the Philippine Supreme Court left the Status Quo Ante Order in place, the executive branches came to Universal's aid. The Philippine Department of Justice and the Philippine Gaming Commission declared the takeover illegal. *See* JX 778. On September 2, 2022, the Philippine National Police helped Universal regain control of the Casino. *Id.*

For CasinoCo, retaking the premises was only the first step in righting the ship. Management had to recreate the Casino's security team, because some of its members had assisted with the takeover. Management had to check for stolen assets. They had to review all of the contracts that Okada and his group had executed. Management also faced the Herculean task of preparing the Company's financial statements.

Meanwhile, the extended outside date was less than a month away. Ader had asked Universal to extend the outside date further so that the transaction could close. *See* JX 757.

What to do about the extension request was not obvious. Takeuchi wanted to extend. JX 793. The SPAC market, however, had deteriorated, and Yip and Van Der Sande were concerned that 26 Capital would face a high level of withdrawals. Regardless of the amount of cash that it brought to the transaction, 26 Capital would receive the same equity stake in the post-transaction entity. A high rate of redemptions simply meant that the Sponsor would receive a greater share. Not knowing about Zama's involvement, Yip and Van Der Sande thought that Ader would receive a windfall. They both thought Universal should not extend the outside date and should let the transaction lapse. Van Der Sande Dep. 101. For help in evaluating Universal's options, they turned to Milbank, which prepared memoranda analyzing the legal risks associated with various options. *See* JX 797 at 12–21, 27–31.

Ader and Eiseman wanted Universal to agree to an extension then close as quickly as possible. Zama began pressuring CasinoCo's auditors at UHY to complete its work on the financial statements. *See* JX 771; JX 787. Through Takeuchi, Ader and Eiseman began to hear that Yip and Van Der Sande had grown skeptical about the transaction. *See* JX 799; JX 800. Ader and Eiseman inferred that Yip and Van Der Sande felt empowered by the dodgy bargain and no longer wanted a U.S. listing. JX 803 at 2–3. They decided to hire a private investigator to find dirt on Van Der Sande. *See* JX 879; JX 894.

During a call on September 12, 2022, Eiseman and Littlejohn advised Takeuchi that Universal should agree to an extension because otherwise 26 Capital would sue and discovery would be very bad. JX 2031 at 9, 14. As part of an effort to seem credible,

42

Eiseman falsely reassured Takeuchi that he was "not part of . . . Jason [Ader]." *Id.* at 70. He repeatedly told Takeuchi "I work for you" and "I think it's clear that I work for you." *Id.* at 71. Eiseman recorded the call, so he could not deny making those false statements. *See* JX 1628. During the call, Eiseman and Littlejohn did everything they could to benefit 26 Capital.

On September 16, 2022, Ader sent Universal a letter alleging breaches of the merger agreement. JX 828. Universal responded and contested the allegations of breach. JX 840.

On September 20, 2022, Takeuchi learned about legal memoranda that Milbank had prepared to analyze Universal's options. Takeuchi felt betrayed by his colleagues. Still thinking that Zama was Universal's contractual advisor, Takeuchi forwarded the memoranda to Eiseman. JX 866.

Eiseman reviewed the memoranda and sent Takeuchi a set of points to make at an upcoming Universal board meeting. JX 844. In one of his points, he asserted, "**Zama is not an agent of 26 Capital.** Zama has no contractual relationship with 26 Capital . . . . Our focus from the beginning had been on creating value for Universal shareholders." *Id.* at 2. That was misleading. Zama had invested in the Sponsor under a subscription agreement and was a party to its LLC agreement. Ever since that investment, Zama had been working as 26 Capital's partner to maximize its returns at Universal's expense. Eiseman then forwarded his email to Ader. JX 844.

## Q. The Universal Directors Flip Flop.

Universal's board of directors held a meeting on September 22, 2022 to consider whether to extend the outside date. JX 889. The meeting was videotaped. JX 1721.

43

During the meeting, the directors reviewed an analysis from Yip and Van Der Sande showing that 26 Capital was unlikely to bring cash to closing. The analysis calculated that closing the de-SPAC transaction would require a net outlay of $92 million, plus annual costs of approximately $10 million. 26 Capital would receive shares worth $69 million. JX 1639. The directors also discussed that CasinoCo's auditors were unlikely to be able to complete their audit work for months, plus the risks posed by the Status Quo Ante Order. JX 889 at 8.

The directors decided not to approve an extension. Violating a directive from Fujimoto not to share the results of the meeting, Takeuchi texted Ader and Eiseman and recounted each director's vote and reasoning for opposing an extension. Takeuchi asked Ader and Eiseman to pretend that they were unaware of the decision. JX 893; JX 900. Takeuchi also emailed Eiseman and asked him how many shares of 26 Capital were owned by Ader. Eiseman sent back a misleading response: "The sponsor (e.g. Jason) of 26 Capital owns 6.9mm shares of stock which is 20% of the total shares outstanding." JX 890 at 1. He did not mention that Zama owned five million of those shares. That night, Ader and Eiseman decided that they needed "to get rid of Hans [Van Der Sande]." JX 902 at 2.

Meanwhile, Ader and Eiseman had flown to Tokyo to meet with Fujimoto in an effort to save the deal. Before the meeting, they coordinated their message, with Eiseman laying out points they would make. *See* Ader Tr. 307–08. The meeting took place on September 26, 2022. Eiseman secretly recorded the meeting.

The meeting was generally businesslike, but Ader and Eiseman were forceful. At one point, Ader threatened the Universal directors with liability. JX 2001 at 68. At another,

44

Ader lied about having met with the Philippine Gaming Commission about the Status Quo Ante Order and claimed that as a result of the fictitious meeting, he had "a very high degree of confidence that the situation will be resolved presently for Universal in the Philippines." *Id.* at 10. Eiseman accused Van Der Sande of working with Okada and seeking to block the deal. *Id.* at 50–51. He also referenced the legal analyses that Milbank had prepared and claimed they were "conclusory and done with malicious intent." *Id.* at 72. By the end of the meeting, Fujimoto had agreed to reconvene the board and propose a one-year extension. *Id.* at 90.

That night, Ader, Eiseman, and Takeuchi went to dinner. Ader told Takeuchi that if the merger agreement was extended, then he was confident that less than 50% of 26 Capital's stockholders would redeem their shares. JX 1558 at 330. Takeuchi later asked Eiseman if that representation could be put in writing, but Eiseman said no. JX 910 at 2; *see* JX 912.

The Universal directors reconvened on September 29, 2022. Several directors emphasized the importance of keeping the redemption rate below 50%, so there would be some capital at closing and the transaction would not result in a net loss. Both Asano and Takeuchi reported on Ader's assurance about the level of redemptions. JX 927.

After the meeting, Asano emailed Ader to report that the Universal directors had voted to extend the merger agreement if 26 Capital accepted certain conditions, including not more than 50% redemptions. JX 921. Ader responded with what he described as "minor" edits, but which actually made the conditions meaningless. JX 922. The parties

then executed an amendment to the merger agreement that extended the expiration date to October 1, 2023. JX 935.

## R.    The Effort To Prepare Financial Statements

One of the post-takeover tasks that CasinoCo's management had to accomplish was securing a new Philippine auditor. After extensive efforts, CasinoCo hired Reyes Tacandong & Co. to work on its financial statements. Management also had to convince UHY to issue an opinion certifying CasinoCo's financial statements. UHY had withdrawn its earlier certification of CasinoCo's 2020 and 2021 financial statements, and UHY was not willing to review Universal's 2022 financial statements until after completing its review of the earlier financial statements. CasinoCo needed certified financial statements for use in Universal's securities filings and eventually for a revised Form F-4.

Both Reyes Tacandong and UHY asked management to make extensive representations on which they could rely. Before management could make those representations, they had to understand what happened during the takeover.

Yip and Van Der Sande prioritized the investigation into the takeover and the work necessary to help Universal with its securities filings. Universal could be delisted if it did not make the required filings, and the deadlines were only months away. Completing the investigation was a prerequisite. By contrast, the new outside date meant that the parties had a full year to close the merger. UHY understood management's priorities and agreed with them. So did Asano. JX 948 at 2.

Zama and 26 Capital had different ideas. On October 7, 2022, one week after obtaining the extension, Ader sent a letter to the Universal threatening "grave

consequences" if the Form F-4 was not filed by the end of November 2022 and the deal did not close by the end of the year. JX 955 at 2. Ader claimed that two of 26 Capital's board members were asking about the transaction status. That was not true. Ader had prompted them to send him emails so he could make that claim. *See* JX 950. Takeuchi nevertheless bought it. JX 960.

On October 18, 2022, Van Der Sande responded with a letter that laid out management's expectations for closing the transaction. JX 998. Because Ader had mentioned his directors and Takeuchi had circulated their emails, Van Der Sande copied the directors on the letter.

Ader and Eiseman seized on Van Der Sande's letter as a vehicle for getting him fired. They decided to have Ader pretend he was furious that the letter was sent to his directors, and Eiseman told Ader to threaten that unless Van Der Sande was removed, he "will take them to court." JX 1013 at 3. Ader told Eiseman to tell Takeuchi that Ader was "more upset than you've ever seen." *Id.* Takeuchi believed their ruse and viewed the letter as Van Der Sande's "way of completely trying to sabotage the SPAC." Takeuchi Tr. 1302. Takeuchi did his best to mollify Ader's imitation ire. *See* JX 1731 at 1.

Ader also pressured UHY to accelerate its work. During November 2022, Zama and 26 Capital held weekly audit update calls with UHY, without any member of CasinoCo's management team present. UHY repeatedly asked to have management included, yet Zama and 26 Capital kept leaving management off the calls. From these meetings, Ader knew that UHY's engagement partner did not believe that CasinoCo's management team was

47

engaged in delay, but rather that they were understandably prioritizing their statutory audit and the filings necessary for Universal's public listing. JX 1064 at 2.

Still unsatisfied with the pace at which events were moving forward, Zama and 26 Capital brought on Calabrese Consulting LLC to prepare the financial statements for the first half of 2022 *without any involvement from management.* JX 2059. Relying on its status as a contractual advisor to Universal, Zama instructed UHY to provide Universal's confidential information to Calabrese. JX 2063. Eiseman told Dan Jones, the lead partner for UHY, that he would make Yip sign the financial statements that Calabrese prepared.[11] In a model of understatement, Jones observed that "Eiseman did not have an appreciation for the process that . . . would need to be undertaken by the company to prepare their financials." Jones Tr. 1462.

When Yip learned about Calabrese's retention, he reported it to CasinoCo board. The directors resolved to investigate how Calabrese had been retained, how it secured access to CasinoCo's non-public financial information, and how it was preparing financial statements without management's involvement. JX 2066 at 329. That was a perfectly reasonable response.

Eiseman, Ader, and their colleagues fell back on their standard strategies of concealment and misrepresentation. When Takeuchi asked Eiseman about Calabrese, Eiseman replied that Zama "did not authorize the sharing of financials." JX 1157. That was

---

[11] Jones was a wholly credible witness and easily the most credible witness in the case.

not true. Ader was aware of and complicit in this deception. *See* JX 1157. Eiseman also tried to justify Calabrese's actions by telling Takeuchi that Calabrese was performing work similar to the preparation of pro forma financials. JX 2057; JX 2058. That was nonsense. Calabrese was not using existing financial statements to prepare a set of pro forma statements. Calabrese was preparing the financial statements themselves.

Eiseman also told UHY to advise Universal that for a SPAC to retain an accountant to help with financial statements was not unusual. JX 1224. That was misleading. A SPAC might hire outside assistance for its own financial statements, or a SPAC might do so with the consent of its counterparty. It was highly unusual—and unprecedented in the experience of 26 Capital's expert—for a SPAC to hire an accountant to prepare financial statements for its counterparty without its counterparty's permission.

While this was happening, UHY told Zama and 26 Capital that it would not review the Calabrese-created financial statements. So Zama and 26 Capital found a small firm in Lakewood, Colorado—B.F. Borgers—and decided to "position it as doing 1H 2022 review in tandem with UHY to be able to move faster." JX 1003 at 2. Borgers lacked any comparable auditing experience, and its principal's testimony calls into question the firm's competence and integrity.

On January 25, 2023, Fujimoto approved the sending of a letter to UHY questioning Calabrese's retention, asking about the sharing of information, and requesting a response within 10 days. Yip sent the letter on January 31, 2023. JX 1329. Van Der Sande and Yip celebrated, believing that it would help stop 26 Capital and Zama's meddling. *See* JX 1308.

49

26 Capital claims that Yip sent the letter to cause UHY to resign. That is not true. Yip and Van Der Sande understood that sending the letter created a risk that UHY could resign, but 26 Capital and Zama had pushed matters to that point.

## S.    26 Capital Files Suit.

On February 2, 2023, 26 Capital and the Sponsor filed suit against Holdings, CasinoCo, and a merger subsidiary. Whether the Sponsor has standing to sue is an open question, but no one has raised it. For simplicity, this decision refers only to 26 Capital and CasinoCo when discussing the two sides' legal positions.

26 Capital seeks a decree of specific performance ordering CasinoCo to use its best efforts to close the merger. Alternatively, 26 Capital seeks damages for breach.

Zama is the real party in interest in this lawsuit. Through the Sponsor, Zama owns an interest in what would be approximately 40% of the post-transaction entity's shares:

| | |
|---|---:|
| 26 Capital's Current Public Float | 3,430,228 |
| Zama's Public Shares | 123,055 |
| The Sponsor's Founder's Shares | 6,875,000 |
| Zama's Share Of The Founder's Shares | 4,000,000 |
| Public Float Post-Close (no redemptions) | 10,305,228 |
| Zama Ownership of Public Float Post-Close (no redemptions) | 40% |

Any redemptions will only increase Zama's share. For his part, Ader has cashed out almost entirely by selling his interest in the Sponsor to Zama and Rimu.

## T.    UHY Resigns.

On February 6, 2023, UHY resigned. The takeover was one contributing factor, and Yip's letter was another, but the litigation was the final straw. Jones Tr. 1467.

50

26 Capital contends that since UHY's resignation, CasinoCo has failed to use its best efforts to hire a replacement auditor. CasinoCo's situation makes for an unattractive engagement, and the evidence on CasinoCo's efforts is mixed. This decision makes no finding on the issue.

Because 26 Capital has emphasized it so heavily, this decision does address one email sent by a Millbank partner during CasinoCo's efforts to find an auditor. The email stated, "I think it is important that we look like we are maximizing chances of actually getting an auditor." JX 1352 at 2. 26 Capital interprets the email as saying, in substance, "I think we need to look like we are trying to get an auditor even though we really aren't." The choice of the words "look like" was unfortunate, but after considering the email in context, I am convinced that what the partner meant was, "I think we need not only to maximize our chances of actually getting an auditor but also document the efforts we are making so that we have a record that reflects that." Management eventually identified a firm that was both qualified and willing to perform the audit: RSM, the U.S. affiliate of CasinoCo's current auditor, Reyes Tacandong.

## U.    Universal Terminates The Merger Agreement.

On June 30, 2023, CasinoCo and Holdings terminated the merger agreement based on material breaches by 26 Capital. This decision does not reach those issues.

## II.    LEGAL ANALYSIS

26 Capital seeks a decree of specific performance requiring CasinoCo to close the de-SPAC transaction. 26 Capital asked for a prompt, post-trial decision on the availability

51

of that remedy, and the court held an expedited trial so that specific performance could be ordered if warranted. On the facts of this case, that form of relief is not available.

Specific performance is a specialized form of mandatory injunction that requires a party to fulfill its contractual obligations. *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at \*6 (Del. Ch. Jan. 24, 2005); *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at \*9 (Del. Ch. Feb. 4, 1998). Specific performance is a remedy for a *proven* breach of contract. The parties dispute whether 26 Capital has met this requirement, but for simplicity, this decision assumes without deciding that CasinoCo failed to use its reasonable best efforts to close the transaction.

The ordinary remedy for breach of contract is an award of damages. *Morabito v. Harris*, 2002 WL 550117, at \*3 (Del. Ch. Mar. 26, 2002). A party seeking specific performance must show that a "not typical" remedy is warranted. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 52 (Del. Ch. 2001). If damages would provide adequate relief, then specific performance is not available. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *Morabito*, 2022 WL 550117, at \*3. This decision assumes that the transaction provides 26 Capital with a unique investment opportunity such that a damages award would not provide adequate relief.[12]

---

[12] That does not mean that damages are unavailable. "[S]pecific performance might be the preferred remedy because the contract relates to a unique property right. But if a court lacks the ability to order specific performance, it does not mean that the plaintiff is out of luck. The plaintiff instead must consider other, less ideal remedial options." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 53 (Del. Ch. 2014).

By definition, the remedy of specific performance contemplates that the parties will perform the contract, so the party seeking that remedy must be ready, willing, and able to perform. *Osborn*, 991 A.2d at 1158. The parties dispute whether 26 Capital can fulfill its obligation to maintain a public listing.[13] This decision assumes that 26 Capital can satisfy that requirement.

Meeting these prerequisites makes it possible for a court to award specific performance, but whether to issue the decree is always a matter of equity. Because specific performance is an equitable remedy, its application must be warranted on the facts and consistent with equitable principles. "[S]pecific performance is a matter of grace that rests in the sound discretion of the court." *Peden v. Gray*, 2005 WL 2622746, at *3 (Del. Oct. 14, 2005) (TABLE). Ultimately, the party seeking specific performance must make a clear and convincing showing that the remedy is warranted.[14]

---

[13] Nasdaq rules require each Global Market-listed security to have at least 400 round-lot holders at the time listing and at least 400 total holders at all times post-listing. It has been unclear since March 2022 whether 26 Capital could meet that requirement. In December 2022, after holders of more than 87% of 26 Capital's shares opted for redemption, 26 Capital had fewer than 300 stockholders.

[14] *See IBP*, 789 A.2d at 52 ("Delaware law . . . requires that a plaintiff demonstrate its entitlement to specific performance by clear and convincing evidence."). The clear and convincing standard does not increase the burden of proof on issues of fact, which remain subject to proof by a preponderance of the evidence. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112. (Del. Ch. 2007). The standard rather reflects the expectation that a court will be reluctant to grant the atypical remedy of specific performance unless a sufficiently persuasive showing has been made. *IBP*, 789 A.2d at 52.

That remains true even if a contract provides for specific performance. Delaware is strongly contractarian, and the presence of a provision calling for specific performance in the event of breach is sufficient to support a decree. *See Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at \*2 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017). But a court is not required to enforce a specific performance provision.[15] The existence of such a provision is sufficient to support a decree of specific performance but does not mandate its issuance.

Here, after weighing the evidence and balancing multiple considerations, the court exercises its discretion against awarding specific performance.

---

[15] *See Morabito*, 2002 WL 550117, at \*2 ("[S]pecific performance is considered extraordinary, awarded on a discretionary basis by courts of equity. Thus . . . there is no 'entitlement' to specific performance . . . . Specific performance is available when it is equitable, and in this case specific enforcement (to repeat) would be inequitable."); *Godwin v. Collins*, 1868 WL 1255, at \*1 (Del. Ch. Mar. 1, 1868).) ("It is the established rule that 'a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court upon a view of all the circumstances.'" (internal citation omitted)); Restatement (Second) of Contracts § 359 cmt. a (Am. L. Inst. 1981), Westlaw (database updated June 2023) [hereinafter Restatement of Contracts] ("Because the availability of equitable relief was historically viewed as a matter of jurisdiction, the parties cannot vary by agreement the requirement of inadequacy of damages, although a court may take appropriate notice of facts recited in their contract."); 3 Dan B. Dobbs, *Law of Remedies* § 12.9(6), at 819 (2d ed. 1993) ("[T]he court may consider the contract provision in favor of specific performance, not as binding, but as an important influence on the exercise of discretion."); *see also* Oliver Wendell Holmes, *The Common Law* 301 (1881) ("The only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the promised event does not come to pass.").

**A.    The Complexity Of Completing The Transaction And Supervising A Reasonable Best Efforts Obligation**

One factor that counsels against specific performance is the complexity of the undertaking and the associated difficulty of providing meaningful judicial oversight. "A promise will not be specifically enforced if the character and magnitude of the performance would impose on the court burdens in enforcement or supervision that are disproportionate to the advantages to be gained from enforcement and to the harm to be suffered from its denial."[16]

26 Capital asks the court to enforce Section 6.4 of the merger agreement, which requires that "each of the Parties shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective as promptly as practicable the Transactions." JX 192 at § 6.4 (the "Reasonable Best Efforts Covenant"). A decree of specific performance enforcing the Reasonable Best Efforts Covenant will not be self-executing, and monitoring compliance with such a provision is more difficult than a provision that requires a party to take specific action. An order directing a party to comply with a best-efforts provision may result in a decree of such "vague generality as to give little or no specific direction to the person or entity subject to the order or would involve the court in the detailed administration of an ongoing, complex transaction." *Carteret*

---

[16] Restatement of Contracts, *supra*, § 366; *accord* 71 Am. Jur. 2d *Specific Performance* § 108; Dobbs, *supra*, § 12.8(3), at 207.

*Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *1 (Del. Ch. 1988). If there are many steps remaining and many transactional approvals to obtain, then "[t]he shadings of conduct that are possible when exercising judgment" give rise to "countless opportunities to try to impede completion of a complex deal." *Id.* at *8. In the *Carteret* case, Chancellor Allen declined to order specific performance of a best efforts obligation, precisely because of the complexities involved in completing the transaction. *Id.* at *9.

In other cases, the court has assessed the facts differently. In *Snow Phipps*, for example, Chancellor McCormick entered a decree of specific performance enforcing a reasonable best efforts provision requiring a financial buyer to secure alternative financing and close. *See Snow Phipps Gp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *55–56 (Del. Ch. Apr. 30, 2021). Other Delaware decisions have also ordered transactional counterparties to close where the court could oversee and enforce compliance.[17] A court can also mitigate the difficulties involved in overseeing compliance with a complex undertaking by appointing a judicial agent, such as a receiver or monitor.[18]

---

[17]*See, e.g., Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *42 (Del. Ch. July 9, 2021); *Level 4 Yoga, LLC v. CorePower Yoga, LLC,* 2022 WL 601862, at *31 (Del. Ch. Mar. 1, 2022), *aff'd*, 287 A.3d 226 (Del. 2022); *Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 7293896, at *4 (Del. Ch. Dec. 26, 2019); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 763 (Del. Ch. Sept. 29, 2008, revised Nov. 19, 2008); *IBP*, 789 A.2d at 87.

[18] *See Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982) (explaining that a court has "inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."), *amended and vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982); *Schwimmer v. U.S.*, 232 F.2d 855, 865 (8th Cir. 1956) (same); 1 Dobbs, *supra*, § 1.4, at 20 (discussing the court's authority to appoint a post-judgment receiver); 1 Ralph Ewing Clark, *The Law and Practice of Receivers* § 240, at 349 (3d ed. 1959)

The principal tasks that must be completed before the transaction can close are the preparation of audited financial statements and the filing of a registration statement for the shares that will be issued. Much of the work has already been done, and the court would not ordinarily view those tasks as so complex as to counsel against a decree of specific

---

(explaining that a receiver can be appointed "after judgment . . . either for the purpose of carrying the judgment into effect, or for the preservation of the property until judgment shall be executed."); 2 John Norton Pomeroy, *Equity Jurisprudence*, § 1335, at 931 (5th ed. 1941) (noting that a court has the power to appoint a receiver "after judgment" in order "to carry into effect a special decree, which could not otherwise be efficiently executed by ordinary process"); Wayne D. Brazil, *Special Masters in Complex Cases: Extending the Judiciary or Reshaping Adjudication?*, 53 U. Chi. L. Rev. 394, 414 (1987) ("Masters have long been used to monitor compliance with injunctions or to administer funds."); Ellen E. Deason, *Managing the Managerial Expert*, 1998 U. Ill. L. Rev. 341, 352 (1998) ("After a finding of liability, masters are often appointed at the remedial stage of complex cases to aid in formulating the decree, assist the court in implementing it, and monitor compliance. In fact, these new roles are reportedly now more commonplace than traditional references to masters." (footnote omitted)); Veronica Root, *Modern-Day Monitorships*, 33 Yale J. Reg. 109, 116–17 (2016) ("One type of posttrial matter with which court-appointed agents assisted courts was to ensure that parties complied with a court's order of specific performance."). Federal Rule of Civil Procedure 53 codifies the court's inherent authority. *See* Irving R. Kaufman, *Masters in the Federal Courts: Rule 53*, 58 Colum. L. Rev. 452, 462 (1958) ("[R]ule 53 was intended merely as a codification of pre-existing procedures, and it may be assumed that references sanctioned by long usage and practice in the federal courts were not intended to be forever foreclosed by the rule."); Elizabeth Montgomery, Comment, *Force and Will: An Exploration of the Use of Special Maters to Implement Judicial Decrees*, 52 U. Colo. L. Rev. 105, 111 (1980) ("[Rule 53] embodies the case law that was established by the Supreme Court in *Ex Parte Peterson*." (footnote omitted)). The rule empowers the courts to appoint a master to "address . . . post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C); *see also* 9C Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2602.1 (3d ed.), Westlaw (database updated Apr. 2023) (discussing reliance on the rule "when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransient or special skills are needed."); *see generally* Wayne D. Brazil, *Referring Discovery Tasks to Special Masters: Is Rule 53 a Source of Authority and Restrictions?*, 8 Am. Bar Found. Res. J. 143, 176 (1983).

performance. In an ordinary case, the court also could mitigate any complexity by appointing a receiver or monitor.

Here, however, dealing with the SEC will be more complex than usual, because the transaction does not contemplate the issuance of securities by an already listed domestic issuer, or even a domestic entity. The Form F-4 must address the securities of a Philippine corporation engaged in the gaming industry, which suffered a forcible takeover last year, and which has a history of internal corporate governance issues. *E.g.*, Takeuchi Dep. 97–98 (citing CasinoCo's weak governance practices).

Those governance problems only became worse as a result of the dodgy bargain that enabled CasinoCo to regain control over the Casino. It will be awkward, to say the least, to craft disclosures that truthfully describe the agreement under which (i) Lazaro and Lorenzana each received $35,000 per month net of taxes and gained the right to appoint six members of a seven member board, (ii) CasinoCo's senior officers received new employment agreements under which they can only be removed by supermajority vote, and (iii) Universal delivered an item to Romualdez to secure his intervention in Universal's favor.

And that is only one side of the transaction. On the other side are 26 Capital and Zama. Both have proven exceedingly aggressive, demonstrated terrible judgment, knew about the dodgy bargain, and engaged in other questionable transactions of their own.

There are considerable challenges involved in completing a multi-jurisdictional transaction, even a transaction—like this one—where much of the work has been done. Those challenges increase exponentially on the facts of this case. Given the factual

landscape and the parties involved, those challenges counsel against a decree of specific performance.

## B.     The Inadequacies Of The Court's Coercive Sanctions

A second factor that a court may consider in determining whether to award specific performance is whether the order can be enforced. "[C]ourts will not specifically enforce contracts if they regard enforcement as futile." Dobbs, *supra*, § 12.8(3), at 808.

> No matter how inadequate the remedy at law may be, a court of equity will not exercise its jurisdiction to grant the remedy of specific performance if the contract is of such a nature that the decree for its specific performance cannot be enforced, and obedience to it compelled, by the ordinary processes of the court.

71 Am. Jur. 2d *Specific Performance* § 111, Westlaw (database updated June 2023). The court's ability to enforce the merger agreement in a meaningful way has been an open issue since the start of the case. *See* Dkt. 18 at 12–14.

The coercive sanctions that a state judge can deploy can be highly effective when the defendants or their assets are located in the United States. The court can impose coercive fines. *Gandhi-Kapoor v. Hone Cap. LLC*, 2023 WL 4628782, at *3 (Del. Ch. July 19, 2023). It can seize or retitle property within its jurisdiction. *See In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 283 A.3d 1183, 1193–94 (Del. Ch. 2022). It can appoint receivers to take control of entities or assets. *See Hone*, 2023 WL 4628782, at *9. It can issue writs of civil capias. *See Arbat Cap. Gp. Ltd. v. Artificial Life, Inc.*, 2020 WL 1811696 (Del. Ch. Apr. 8, 2020) (ORDER); *see also Palma Cap. Ltd. v. Westergaard.com, Inc.*, 2020 WL 2495979, at *1 (Del. Ch. May 13, 2020); *Deutsch v. ZST Digit. Networks, Inc.*, 2018 WL 3413362, at *2 (Del. Ch. June 12, 2018) (ORDER). It can find a party in

civil contempt or initiate proceedings for criminal contempt. *See* 10 *Del. C.* § 7129; 11 *Del. C.* § 1271. A court can also exercise its inherent authority to impose other sanctions as the situation warrants, because "[c]ourts have . . . inherent power to provide themselves with appropriate instruments required for the performance of their duties." *In re Peterson*, 253 U.S. 300, 312 (1920); *see also id.* at 309–10 ("New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice.").

These tools have less purchase when a defendant and its assets are located overseas. The sun has set on the era in which a nation might send gunboats to enforce a judgment issued by its courts.[19] Delaware has no blue water navy to send, and the United States Constitution confers authority over international affairs on the federal government, not the

---

[19] In the past, powerful nations enlisted the help of their militaries to intimidate less formidable nations into complying with foreign judgments. *See, e.g.*, *Theodore Roosevelt's Corollary to the Monroe Doctrine (1905)*, Nat'l Archives (Feb. 8, 2022), https://www.archives.gov/milestone-documents/roosevelt-corollary ("European intervention in Latin America . . . resurfaced as an issue in U.S. foreign policy when European governments began to use force to pressure several Latin American countries to repay their debts. For example, British, German, and Italian gunboats blockaded Venezuela's ports in 1902 when the Venezuelan government defaulted on its debts to foreign bondholders."); Greg Rosalsky, *'The Greatest Heist in History': How Haiti Was Forced To Pay Reparations For Freedom*, NPR Planet Money (Oct. 5, 2021, 10:25 AM), https://www.npr.org/sections/money/2021/10/05/1042518732/-the-greatest-heist-in-history-how-haiti-was-forced-to-pay-reparations-for-freed ("In July 1825, the French King, Charles X, sent an armed flotilla of warships to Haiti with the message that the young nation would have to pay France 150 million francs to secure its independence, or suffer the consequences. That sum was 10 times the amount the United States had paid France in the Louisiana Purchase, which had doubled the size of the U.S. Almost literally at gunpoint, Haiti caved to France's demands in order to secure its independence.").

several states. U.S. Const. art. I, § 10. Here, the Casino is located in the Philippines, and CasinoCo is a Philippine entity. Universal, the ultimate parent, is a Japanese entity headquartered in Tokyo. The court could issue bench warrants directed at individuals who failed to cause the entity defendants to comply with the court's decree, and those individuals would face arrest and extradition to Delaware if and when they travel to the United States, but if they were content to treat the rest of the world as their oyster, they would remain beyond this court's authority.

26 Capital might ask a Philippine court to enforce this court's decree as a matter of comity, but the dodgy bargain again casts a long shadow. It reveals that outcomes in the Philippines may turn on political influence, and the individuals who orchestrated that bargain are now entrenched on CasinoCo's board. Closing the transaction would threaten their positions because CasinoCo would become subject to American law, including the Foreign Corrupt Practices Act. Having deployed political influence to achieve the dodgy bargain, they might be expected to deploy political influence to protect their gains.

The court does not take this consideration into account happily, because it acknowledges the limitations on its power as a court of equity and the possibility that some parties or actions may be beyond its reach. That is literally true in this case. The court is not dealing with an obstreperous billionaire or other headstrong individual whose body and assets are subject to coercive sanction through the American justice system. In this case, the defendants are, quite literally, outside the range of the court's armamentarium. Firing at such a target just wastes ammunition.

A decree ordering the foreign entities in this case to close the transaction is likely a nullity. That consideration counsels against issuing the decree.

## C. The Status Quo Ante Order

A third factor that counsels against a decree of specific performance is the existence of the Status Quo Ante Order. "Courts of equity will only order specific performance when performance of the contract by the defendant is possible." 71 Am. Jur. 2d *Specific Performance* § 58. A court must also consider the consequences of issuing a remedy, and in some cases those consequences may warrant withholding equitable relief. *See N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 280 (7th Cir. 1986) (Posner, J.); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted)).

> The Status Quo Ante Order, which remains in effect, decrees that
>
> effective immediately and continuing until further orders from this Court . . . petitioner and respondents, your agents, representatives, or persons acting on [sic] your place or stead, are hereby required to observe the status quo prevailing prior to petitioner's removal as stockholder, director, chairman, and CEO of [CasinoCo] in 2017.

JX 500 at 6.

To be sure, the defendants did not originally view the Status Quo Ante Order as a meaningful impediment to closing the transaction, and with good reason. Okada had been trying to set aside his removal for five years. The courts of Japan denied him relief. The courts of Hong Kong denied him relief. When he turned to the courts of the Philippines, the trial court and the intermediate court denied his requests for interim relief. With that

backdrop, the defendants understandably believed that the Status Quo Ante Order resulted from a misunderstanding. They thought they could clarify the situation for the Philippine Supreme Court, and the justices would vacate the order.

But that did not happen. On May 2, 2022, CasinoCo filed an Extremely Urgent Motion for Reconsideration of the Status Quo Ante Order. JX 2025. CasinoCo stressed that

> [u]nless reconsidered, the SQAO creates a grave and imminent risk of causing the default and bankruptcy of the UEC group. The UEC Notes issued by UEC and guaranteed by [CasinoCo] include a provision that essentially prohibits the voting by a shareholder in favor of or electing Petitioner Okada or his representative as a Board Director of UEC or [CasinoCo]. If that happens, it is likely that international creditors will try to force UEC and [CasinoCo] into bankruptcy, which could result in the loss of jobs of almost 6,000 Filipino employees of [CasinoCo] and 1,000 Japanese employees of UEC. These job losses would be a result of the SQAO and/or Petitioner Okada's actions. The Honorable Court is urgently and respectfully asked not to let this happen and immediately reconsider the SQAO.

*Id.* at 4. After not receiving a response, CasinoCo filed supplements on May 13 and June 10. The Philippine Supreme Court never responded to those findings.

After conventional methods failed, Lazaro and Lorenzana proposed the dodgy bargain, which included the unconventional method of delivering an "item" to Romualdez to bring his influence to bear. *See* JX 725; Asano Tr. 794–95. He did, but without success.

Instead, the Philippine Supreme Court issued the Clarifying Order. It did not modify the Status Quo Ante Order. *See* JX 753 at 10–13 (finding "no merit" in CasinoCo's arguments challenging the scope and legal basis of Status Quo Ante Order). It made clear that the Philippine Supreme Court was aware of the de-SPAC transaction and CasinoCo's argument that it would not violate the Status Quo Ante Order. *See id.* at 4, 18. But the Philippine Supreme Court did not decide that issue. Instead, the Court left the Status Quo

Ante Order in place and instructed the intermediate court of appeals to determine whether CasinoCo intended to list its shares in the United States. *Id.* at 18.

At trial, CasinoCo proffered the testimony of Francis Jardeleza, a former Associate Justice of the Philippine Supreme Court who served before his appointment as Solicitor General of the Philippines. In addition to his government service, Justice Jardeleza worked in private practice for over two decades, and he has taught courses at the University of the Philippines College of Law since 1993.

Justice Jardeleza opined that closing the transaction could violate the Status Quo Ante Order, and he explained the potential consequences. Jardeleza Tr. 1253–54.

> [CasinoCo] is specifically a party to the suit and therefore it is subject to the status quo order. In the case of [CasinoCo], it is my opinion that it cannot do anything to implement the agreement defined in this litigation to have this SPAC transaction and that if [CasinoCo] or any party would violate the SQAO order, they run the risk that the Supreme Court of the Philippines may hold it in contempt or the Supreme Court of the Philippines may, after notice and hearing, order restitution or damages.

*Id.* at 1254. Criminal contempt in the Philippines is punishable by up to six months in prison. Paraiso Tr. 1389.

In response, 26 Capital presented the testimony of Joshua Paraiso, a Philippines lawyer who opined that the Status Quo Ante Order allows the transaction to close. He emphasized that "a status quo ante order does not direct the doing or undoing of a certain act." *Id.* at 1340. Under Paraiso's interpretation, significant transactions like filing for bankruptcy or a sale of all or substantially all of CasinoCo's assets would not violate the Status Quo Ante Order either. *Id.* at 1359, 1361, 1364, 1372–74.

Paraiso also suggested that if the Philippine Supreme Court had intended to prevent the transaction from closing, the justices would have issued a preliminary injunction. *Id.* at 1344–45. Rather, in his view, the Status Quo Ante Order merely returns matters "to a time when Kazuo [Okada] was a stockholder, director, chairperson, and CEO of [CasinoCo]" and instructs the parties to "pretend as if he was still occupying those positions." *Id.* at 1371. Paraiso reasons that the Status Quo Ante Order therefore only permits Okada to protect his beneficial interest in CasinoCo using whatever powers he would have had based on those positions. *Id.* But as Paraiso admitted, that interpretation would mean the Status Quo Ante Order lacks any practical effect, because those positions did not give Okada the power to take action or block a vote. *Id.* at 1372. It seems unlikely that the Philippine Supreme Court intended to issue an order that accomplished nothing at all.

Justice Jardeleza's testimony was persuasive. Paraiso's was not. As Justice Jardeleza explained, closing the transaction could violate the Status Quo Ante Order. Complying with a decree of specific performance could expose CasinoCo and its affiliates, including the directors and officers of those entities, to a finding of contempt. The conflict between this court's decree of specific performance and the Status Quo Ante Order would create a Catch-22.

As a matter of comity, a court should be reluctant to issue an order that would cause a citizen of a foreign country to risk violating an order issued by that country's highest court. This concern is amplified where complying with the decree of specific performance may cause a party to take action that could subject it to criminal contempt. Perhaps there are circumstances where a court would view that step as warranted. This is not that case.

65

## D.    Inequitable Conduct

A fourth factor that counsels against specific performance is 26 Capital's inequitable conduct. A plaintiff "seeking the aid of equity's extraordinary remedies [does] so subject to the maxim that he who seeks equity must do equity." *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 54 (Del. 1952). Specific performance "is a purely equitable remedy," *Chavin v. H. H. Rosin & Co.*, 246 A.2d 921, 922 (Del. 1968). Specific performance therefore may be denied when "the 'equities' or ethical considerations favor the defendant." Dobbs, *supra*, § 12.8(1), at 805. A request for specific performance

> will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of [its] position, or by any other means which are unconscientious. . . . It may be that the contract is not illegal; that no defense could be set up against it at law; and even that it possesses no features or incidents which could authorize a court of equity to set it aside and cancel it. Specific performance is refused simply because the plaintiff does not come into court with clean hands.

Pomeroy, *supra*, § 400, at 100–01, *quoted in Turchi v. Salaman*, 1990 WL 27531 (Del. Ch. Mar. 14, 1990), at *8.

26 Capital engaged in the type of conduct that should not be rewarded with a decree of specific performance. Ader and Eiseman reached a *de facto* agreement to leverage Eiseman's position of trust with Universal to enrich themselves. They acted as partners to gain and exploit their inequitable advantage over Universal and its subsidiaries. They concealed their relationship and misled Universal about its existence.

- Within a twenty-four-hour period, Zama acquired an interest in the Sponsor, then Ader worked with Eiseman to prepare a letter of intent that favored 26 Capital.

66

When Ader sent it to Universal, Eiseman pretended he had never seen it before and advised Universal to accept it.

- Eiseman and Littlejohn worked with Ader and 26 Capital's counsel to draft a pro-SPAC merger agreement. Eiseman then pretended never to have seen it and advised Universal to accept it.

- Eiseman participated in discussions with Universal and its counsel as a trusted advisor. During those discussions, he asserted that terms were business understandings that could not be revisited, when they were not, and he argued that provisions that were advantageous to Universal should not be included.

- Eiseman participated in calls during the negotiation of the merger agreement as a contractual advisor to Universal. During those calls, he secretly texted with Ader and gave him advice.

- After the merger agreement was signed, Eiseman secured a second engagement from Universal that included contingent compensation to incentivize him to work to close the transaction, when he already had an overriding economic incentive to complete the transaction and favor 26 Capital because of his interest in the Sponsor. 26 Capital's counsel advised Ader on the Second Engagement Letter.

- After the merger agreement was signed, Eiseman secretly worked hand in hand with Ader to pressure Universal and achieve an outcome favorable to 26 Capital.

- After Universal agreed to extend the outside date for the transaction, Ader and Eiseman interfered in CasinoCo's internal operations by giving instructions to its auditors, unilaterally hiring Calabrese and giving instructions to Calabrese. Both lied about their involvement.

- Eiseman frequently drafted communications for Ader to send to Universal. They kept Eiseman's role as ghostwriter secret.

- 26 Capital and Zama have collaborated on this litigation, which Zama is co-funding.

26 Capital tries to dodge these unfavorable facts by arguing that they "center on Zama." Pl. Br. at 38. But the record is clear that 26 Capital and Zama, through their principals Ader and Eiseman, acted as partners in a joint effort to force through a deal on their terms. Put more pejoratively, they engaged in a conspiracy to mislead Universal and

67

CasinoCo. The actions taken by Zama to advance their joint cause are therefore properly attributed to 26 Capital.

26 Capital argues in response that Ader had no reason to think Eiseman was doing anything wrong, and that he reasonably relied on the First Engagement Letter and a representation from Eiseman that Universal had approved Zama's investment in the Sponsor. Pl. Reply Br. at 24. At best for Ader, he might have reasonably believed at the outset that Zama received permission to invest in the Sponsor. But after that, he was confronted with a ceaseless parade of indications to the contrary. He received ongoing, covert advice from Eiseman and Littlejohn, and he participated in secret conversations where Eiseman and Littlejohn demonstrated that they were working with Ader and against Universal. Eiseman repeatedly instructed Ader to take steps to keep his involvement secret, and Ader followed those instructions. Later on, Ader misrepresented his relationship with Eiseman by denying there was one, and 26 Capital did not disclose Zama's investment in its 2021 Form 10-K. *See, e.g.*, JX 141; JX 2087 & JX 149; JX 541. By the end of August, Ader had seen enough that he could not have believed that Eiseman was acting legitimately. Ader's insistence that he thought that what he and Eiseman were doing was legitimate is not a defense, but rather self-indictment.

26 Capital and Zama engaged in the type of behavior that makes it inequitable to reward them with a decree of specific performance.

## E.     The Balance of the Equities

When determining whether to award equitable relief, the court always considers the balance of the equities. That is true for specific performance as well. *Morabito*, 2002 WL

550117, at *2 ("[T]he Court must determine whether the 'balance of equities' tips in favor of specific performance."). For a decree of specific performance to issue, the equities must favor that outcome clearly and convincingly. *IBP*, 789 A.2d at 52. In this case, the equities do not favor a decree of specific performance.

26 Capital's strongest equity is the specific performance provision in the merger agreement. "To say that Delaware prides itself on the contractarian nature of its law risks understatement." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565 (Del. Ch. 2023). The court has taken seriously Delaware's policy interest in upholding contracts and 26 Capital's interest in having the specific performance provision upheld. In this case, the other factors that this decision has discussed outweigh those interests.

26 Capital's other meaningful equity is the interests of its unaffiliated stockholders. They face a risk of harm if the deal does not close, but that factor does not carry the day.

First, 26 Capital's stockholders cannot truly claim the status of innocent victims. They invested in 26 Capital, backed Ader and his management team, and undertook to benefit from the gains or suffer the losses that Ader and his team delivered. This decision has chronicled the many missteps that Ader and his team committed, and they had the bad luck to enter into a deal that was disrupted by the Status Quo Ante Order and the takeover. The stockholders signed up for the ride. If they think they have claims against Ader and other members of 26 Capital's management, then they can bring them. What 26 Capital cannot do is wrap itself in the mantle of its stockholders to pretend that none of the events described in this case ever happened. That argument recalls the frequent claims that Ader and Eiseman made on the stand to the effect that they were justified in doing outrageous

69

things because they were obligated to serve their stockholders. That assertion is a perversion of the fiduciary regime. Fiduciary duties exist to check management misbehavior. They are not a license for management to misbehave.

On a more granular level, 26 Capital's appeal to the interests of its stockholders invokes the minority to benefit the majority. Nearly 88% of Universal's public stockholders have redeemed, so the Sponsor's Founder Shares now represent 68% of the SPAC's equity. Ader has largely sold out to Zama and Rimu, so they will be the principal beneficiaries of the deal. Zama owns 60% of the Sponsor economics, so Zama is by far the largest beneficiary. Yet Zama is one of the principal wrongdoers.

26 Capital is also not the only entity with stockholders. Universal has stockholders too. If we assume that stockholders are innocent, there will be losses imposed on innocent victims no matter the outcome.

Another equity that 26 Capital can cite is Universal's own misconduct. This decision has assumed that CasinoCo breached its efforts obligation, and Universal also entered into the dodgy bargain. That said, Ader and Eiseman knew about and condoned the dodgy bargain, which seemed at the time to be the only path to regain control of the Casino. At best for 26 Capital, both sides behaved badly, but that does not mean that the penalties offset and we pretend no one did anything wrong. The actions of both sides have tainted the transaction, making it one where the balancing of the equities counsels against a specific performance decree.

## III.    CONCLUSION

26 Capital has failed to demonstrate clearly and convincingly that an award of specific performance is warranted. Exercising its discretion, the court holds that specific performance is unavailable.

This ruling does not mean that 26 Capital will not be entitled to any remedy. To the extent 26 Capital has proven a breach of contract and Universal has not proven any of its affirmative defenses, then 26 Capital may be able to recover damages. This decision has only addressed the availability of specific performance. It has not ruled on the existence of breach, nor on Universal's affirmative defenses. The issue of damages also must be addressed, and the court has scheduled a second-phase trial to address that issue.